**CHAMBERLAIN D'AMANDA**
Matthew J. Fusco
1600 Crossroads Building
Two State Street
Rochester, New York 14614
Tel: (585) 232-3730
Fax: (585) 232-3882

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ) | |
| IN RE BAUSCH & LOMB, INC. ) | MASTER FILE NO: 06-CV-6297-MAT-MWP |
| ERISA LITIGATION ) | |
| ) | |

## CONSOLIDATED CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT

**SCHATZ NOBEL IZARD, P.C.**
Robert A. Izard
William Bernarduci
20 Church Street
Hartford, CT 06103
Tel: (800) 797- 5499
Fax: (860) 493-6290

*Co-Lead Counsel*

**SCHIFFRIN & BARROWAY, LLP**
Joseph H. Meltzer
Edward W. Ciolko
280 King of Prussia Road
Radnor, PA
Tel: (212) 907-0700
Fax: (212) 818-0477

*Co-Lead Counsel*

**GAINEY & MCKENNA**
Thomas J. McKenna
295 Madison Avenue, 4th Floor
New York, NY 10017
Tel: (212) 983-1300
Fax: (212) 983-0383

*Co-Lead Counsel*

For their Consolidated Class Action Complaint for Violations of the Employee

Retirement Income Security Act ("ERISA") (the "Complaint"), Plaintiffs allege as follows:

## **INTRODUCTION**

1.      This is a class action brought by participants in the Bausch & Lomb 401(k)

Account Plan (the "Plan"), pursuant to §§ 502(a)(2) and (a)(3) of ERISA, 29 U.S.C. §§

1132(a)(2) and (a)(3), against the fiduciaries of the Plan for the violations of ERISA.

2.      The Plan is a defined contribution plan sponsored by Bausch & Lomb

Incorporated ("Bausch & Lomb" or the "Company").

3.      Plaintiffs bring this action against Defendants seeking Plan-wide relief on behalf

of a class which includes the Plan and Plan participants for whose individual accounts the Plan

invested in the Bausch & Lomb Stock Fund (the "Fund") during the period from May 25, 2000

through May 3, 2006  (the "Class Period").

4.      Plaintiffs' claims arise from the failure of Defendants, who are fiduciaries of the

Plan, to act solely in the interest of the Plan and the participants and beneficiaries of the Plan,

and to exercise the required skill, care, prudence and diligence in administering the Plan and the

Plan's assets.

5.      During the Class Period, Defendants failed to take action to protect the Plan from

investing in the Fund when the price of the Fund shares was artificially inflated due to (a)

misrepresentations and omissions regarding the Company's financial statements and condition

and (b)  misrepresentations and omissions regarding the health and financial risks associated

with the marketing and sale of the Company's ReNu® with MoistureLoc® Multi-Purpose

Solution ("*ReNu* or "*ReNu with MoistureLoc*" ) product.

6.      Plaintiffs' claims arise out of financial irregularities during the Class Period wherein the Company and its senior executives reported false information about Bausch & Lomb's financial results, and failed to disclose material adverse information about the true nature of the Company's revenues, the lack of adequate internal controls and the underpayment of taxes which caused millions of dollars in penalties and ultimately resulted in the restatement of the Company's financials over a period of five years.

7.      With respect to *ReNu*, the Defendants failed to disclose serious health problems caused by the use of the product, including the potential for eye infections and blindness. Despite having been put on notice of these health problems, the Defendants remained silent and continued to tout *ReNu*.  Ultimately, given the seriousness of the health problems created by *ReNu*, the Company halted all sales of *ReNu*.

8.      Collectively, these improprieties caused the Company to suspend all global sales of *ReNu* and restate its financial results from at least 2000 through the first half of 2005.  These improper activities artificially inflated the value of the Fund and Bausch & Lomb common stock. Yet, throughout the Class Period, while the Plan continued to invest in the Fund and the Fund continued to invest in Bausch & Lomb stock, the Company's top officers and directors sold their holdings of artificially inflated Company stock for millions of dollars.

9.      Plaintiffs allege in Count I that the Defendants, who were responsible for investing the assets of the Plan, breached their fiduciary duties to Plaintiffs and the Plan, in violation of ERISA, by failing to manage the Plan's investments in the Fund prudently and loyally.  Plaintiffs allege that it was imprudent for the Plan to invest in the Fund and for the Fund to invest in Bausch & Lomb stock because the prices of the Fund and the Company stock were artificially inflated by these improprieties.

10.     In Count II, Plaintiffs allege that the Defendants, who were responsible for communicating with participants regarding the Plan's assets, failed to provide participants with complete and accurate information regarding Bausch & Lomb sufficient to advise participants of the true risks of investing Plan assets in the Fund.

11.     In Count III, Plaintiffs allege that the Defendants, who were responsible for the selection, removal, and, thus, monitoring of the Plan's other fiduciaries, failed to monitor the performance of their fiduciary appointees properly and to remove and replace those whose performance was inadequate.

12.     In Count IV, Plaintiffs allege that Defendants breached their duties and responsibilities as co-fiduciaries by failing to prevent breaches by other fiduciaries of their duties of prudent and loyal management, complete and accurate communications, and adequate monitoring.

13.     In Count V, Plaintiffs state a claim against Bausch & Lomb for knowing participation in the fiduciary breaches alleged below.

14.     This action is brought on behalf of the Plan and seeks losses to the Plan for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2).  In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiffs seek other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, a constructive trust, restitution, equitable tracing, and other monetary relief.

15.     As a matter of substantive law, ERISA §§ 409(a) and 502(a)(2) authorize participants such as Plaintiffs to sue in a representative capacity on behalf of the Plan for losses suffered by the Plan as a result of breaches of fiduciary duty.  Since an appropriate procedural

vehicle to assert such claims is a class action pursuant to Fed. R. Civ. P. 23, Plaintiffs also bring this action as a class action on behalf of all participants and beneficiaries of the Plan during the Class Period.

16.     Because the information and documents on which Plaintiffs' claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiffs' allegations are, by necessity, made upon information and belief.  At such time as Plaintiffs have had the opportunity to conduct sufficient discovery, Plaintiffs will, to the extent necessary and appropriate, amend this Complaint, or, if required, seek leave to amend, to add such other additional facts as are discovered that further support their claims.

## JURISDICTION AND VENUE

17.     **Subject Matter Jurisdiction**.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

18.     **Personal Jurisdiction**.  ERISA provides for nation-wide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All of the Defendants are either residents of the United States or subject to service in the United States, and this Court therefore has personal jurisdiction over them.  This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would all be subject to the jurisdiction of a court of general jurisdiction in the State of New York.

19.     **Venue**.  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside and/or transact business in this district.

## PARTIES

### Plaintiffs

20.     **Plaintiff Paul Hernandez  ("Hernandez ")** was at all relevant times a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).  During the Class Period, Hernandez's Plan account invested in shares of the Fund.

21.     **Plaintiff Diane Johnson ("Johnson")** was at all relevant times a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).  During the Class Period, Johnson's Plan account invested in shares of the Fund.

22.     **Plaintiff Dorothy McMillian ("McMillian")** was at all relevant times a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).  During the Class Period, McMillian's Plan account invested in shares of the Fund.

### Defendants

23.     **Defendant Bausch & Lomb Incorporated ("Bausch & Lomb or the "Company")** is a New York corporation with its principal executive offices located in Rochester, New York.

24.     **Defendant William M. Carpenter ("Carpenter")**, former President and Chief Executive Officer of the Company, served as a director of the Company from 1996 until 2001. Defendant Carpenter also served as a member of the Employee Benefits Administrative Committee, as set forth below.

25.     **Defendant Ronald L. Zarrella ("Zarrella")** was from 2001 to the present the Chief Executive Officer, President and Chairman of the Board of Directors of Bausch & Lomb. He served as a director of the Company from 2001 to the present and served as the Chair of the Executive Committee during the Class Period.

26.     Defendants Carpenter and Zarrella are referred to as the "**Director Defendants**."

27.     **Defendant Employee Benefits Administrative Committee (the "Administrative Committee")**.  The Administrative Committee was an informal association of Company employees acting in the course of their regular employment with the company.  The Administrative Committee was a named fiduciary and administrator of the Plan.

28.     **Members of the Administrative Committee**.  Upon information and belief, in addition to Defendant Carpenter, the following individuals were members of the Administrative Committee during the Class Period:

(a)     **Defendant Gina E. Campbell ("Campbell")** – Manager, Corporate Benefits during the Class Period, served on the Administrative Committee from 2004 to 2005.

(b)     **Defendant Daryl M. Dickson ("Dickson")** – Senior Vice President, Human Resources until 2002, served on the Administrative Committee from 2000 to 2002.

(c)     **Defendant J. Calven Howell ("Howell")** – served on the Administrative Committee in 2005.

(d)     **Defendant Jurij Z. Kushner ("Kushner")** – Corporate Vice President, Controller during the Class Period, served on the Administrative Committee from 2003 to 2006.

(e)     **Defendant Stephen C. McCluski ("McCluski")** – former Senior Vice President and Chief Financial Officer during the Class Period, served on the Administrative Committee from 2000 to 2002.

(f)     **Defendant David R. Nachbar ("Nachbar")** – Senior Vice President Human Resources during the Class Period, served on the Administrative Committee from 2003 to 2006.

(g)      **Defendant Alan H. Resnick ("Resnick")** – Corporate Vice-President, Treasurer during the Class Period, served on the Administrative Committee from 2000 to 2002.

(h)      **Defendant Susan A. Roberts ("Roberts")** – Vice President and General Counsel during the Class Period, served on the Administrative Committee from 2003 to 2006.

(i)      **Defendant Robert B. Stiles ("Stiles")** – Senior Vice President and General Counsel during the Class Period, served on the Administrative Committee from 2000 to 2002.

(j)      **Defendant Jennifer Vossler ("Vossler")** – Vice President, Compensation and Benefits during the Class Period, served on the Administrative Committee from 2003 to 2004.

(k)      **Defendant Laurie L. Zaucha ("Zaucha")** – Vice President, Global Compensation and Benefits, served on the Administrative Committee in 2006.

(l)      **Defendants John and Jane Doe 1-10**.  Plaintiffs do not currently know the identity of all the Administrative Committee members during the Class Period.  Therefore, some of the members of the Administrative Committee are named fictitiously, as Defendants John and Jane Doe 1-10.  Upon information and belief, they are senior employees of the Company.  Once their true identities are ascertained, Plaintiffs will seek leave to join them under their true names.

29.      The Administrative Committee and its members (Defendants Campbell, Carpenter, Dickson, Howell, Kushner, McCluski, Nachbar, Resnick, Roberts, Stiles, Vossler, Zaucha and John and Jane Does 1-10), are referred to as the "Administrative Committee Defendants."

30.     **Defendant Employee Benefits Investment Committee ("Investment Committee")**.  The Investment Committee was an informal association of Company employees acting in the course of their regular employment with the company.  The Administrative Committee was a named fiduciary who shared direct responsibility for the Plan.  On information and belief, the Investment Committee was also referred to as the Investment Review Committee.

31.     **Members of the Investment Committee**.  Upon information and belief, several Administrative Committee members also served on the Investment Committee, including, Defendant Howell, who served on the Investment Committee in 2004, Defendant McCluski, who served on Investment Committee from 2000 to 2006, Defendant Resnick, who served on the Investment Committee from 2000 until December of 2004, Defendant Stiles, who served on the Investment Committee from 2000 until 2006.  In addition to these Administrative Committee members, the following individuals were members of the Investment Committee during the Class Period:

(a)     **Defendant Glenn R. Graham ("Graham")** – served on the Investment Committee in 2000.

(b)     **Defendant Angela J. Panzarella ("Panzarella")** – Corporate Vice President, Global Vision Care since 2001; Corporate Vice President, Investor Relations (1997-2001), served on the Investment Committee from December 2000 to 2006.

(c)     **Defendant Efrain Rivera ("Rivera")** – Senior Vice President and Chief Financial Officer (March 2007 – present); Corporate Vice President and Treasurer (2004-March 2007); Corporate Vice President and Assistant Treasurer (2003-2004); Leave of Absence (2003); Corporate Vice President and President, Latin America and Canada (2002-2003); President, Bausch & Lomb Latin America and General Manager, Bausch & Lomb Mexico (2001-2002);

Vice President and Controller, Vision Care (1998-2001), served on the Investment Committee from February 2004 to 2006.  On information and belief, Defendant Rivera was also a member of the Plan's Administrative Committee as Rivera signed annual reports for the years 2004 and 2005 on behalf of the Bausch & Lomb Employee Benefits "Administration" Committee.

(d)      **Defendant Susan Topel ("Topel")** – Vice President, Global Treasury Operations, served on the Investment Committee from 2000 to 2006.

(e)      **Defendants John and Jane Doe 11-20**.  Plaintiffs do not currently know the identity of all the Investment Committee members during the Class Period. Upon information and belief, they are senior employees of the Company.  Therefore, some of the members of the Investment Committee are named fictitiously, as Defendants John and Jane Doe 11-20.  Once their true identities are ascertained, Plaintiffs will seek leave to join them under their true names

32.      The Investment Committee and its members (Defendants Graham, Howell, McCluski, Panzarella, Resnick, Rivera, Stiles, Topel and John and Jane Does 11-20) are referred to as the "Investment Committee Defendants."

## THE PLAN

**A.      Nature of the Plan**

33.      The Plan is "employee pension benefit Plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).  Further, it is an "eligible individual account Plan" within the meaning of ERISA § 407(d)(3), 29 U.S.C. § 1107(d)(3), and a "qualified cash or deferred arrangement" within the meaning of I.R.C. § 401(k), 26 U.S.C. § 401(k).  While the Plan is not a party to this action, pursuant to ERISA, the relief requested in this action is for the benefit of the Plan, pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

34.     The Plan's Investment Policy ("Investment Policy") plainly sets forth that the purpose of the Plan was to facilitate and promote retirement savings:  "The Plan was established for the purpose of providing retirement income to eligible employees of Bausch & Lomb."

35.     The Summary Plan Descriptions for the year 2006 also emphasized that the purpose of the Plan was retirement savings, stating "Your 401(k) Account benefit is designed to provide you with significant opportunity to save money.  Combined with Social Security and your personal savings, it will help you reach your savings goals."

36.     The Plan's Investment Policy highlighted the importance of the selection and retention of prudent investment alternatives by the Plan fiduciaries for the Plan.  The Investment Policy provided:

> Recognizing that a defined contribution program can provide a primary method for retirement savings and that individual participants will have differing circumstances and investment objectives, this Plan offers a variety of investment alternatives intended to provide a **sound** and flexible means to materially affect both the potential return and degree of risk in each participants account.
>
> *   *   *
>
> The Committee will bear in mind the Plan's objective of providing retirement income to participants and will **choose prudent investment options**.

(Emphasis added).

37.     Importantly, the Plan did not require that the Bausch & Lomb Stock Fund be included as an investment option.

38.     The assets of an employee benefit Plan, such as the Plan, must be "held in trust by one or more trustees."  ERISA § 403(a), 29 U.S.C. § 1103(a).  During the Class Period, the assets of the Plan were held in trust by the Northern Trust Company ("Northern Trust") until

January 1, 2005.  Effective January 1, 2005, Bausch & Lomb contracted with Fidelity

Management Trust Company ("Fidelity") to be the trustee and record keeper for the Plan.

39.      As of December 31, 2004, Company stock accounted for approximately 39% of

the Plan's assets.

40.      During the Class Period, the Plan had two separate components: (a) a contributory

portion, which consisted of participant contributions ("Voluntary Contributions"), and (b) a

Company base and matching component, which consisted of employer contributions ("Employer

Contributions").

**B.      Voluntary Contributions**

41.      Under the Plan, each participant had the option for each payroll period to elect to

contribute a portion of their eligible pre-tax compensation through directed reductions of their

pay.  Each participant could elect to contribute an additional 1% to 6% of his/her compensation

on an after-tax basis.  However, each participant's rate of pre-tax savings contributions when

added to the rate of after-tax savings and contribution was not allowed to exceed a percentage of

the participant's eligible compensation.  Upon information and belief, prior to January 1, 2002,

the maximum percentage was 21% of eligible compensation.  Effective January 1, 2002, the

maximum percentage was raised to 56% of eligible compensation.

**C.      Employer Contributions**

42.      The Company also made employer contributions to the Plan on behalf of

participants.  According to the Plan's Form 11-K, the Company contributed "100% of the first

3% of each participant's pre-tax savings contributions plus 50 % of the next 2 % of each

participants pre-tax savings contributions."  Effective January 1, 2005, this amount was changed

to 150% of the first 5% of each Participant's pre-tax savings contributions.  This was referred to as the "Company Matching Contribution."

43.      For all employees with at least one year of employment, including those that did not voluntarily contribute to the Plan, the Company contributed to the Plan a fixed contribution of 0.5% of the employee's eligible compensation.  This was referred to as the Company's Base Contribution.  Effective January 1, 2005, this amount was increased to 2.5 % and became effective immediately upon hire.

44.      Prior to January 1, 2005, all Employer Contributions were invested in the Fund and remained in the Fund until a Participant reached age 55.  This restriction was removed effective January 1, 2005, after which Employer Contributions were initially invested in the Fund but could be transferred to another available Plan investment.

## DEFENDANTS' FIDUCIARY STATUS

45.      **Named Fiduciaries**.  ERISA requires every Plan to provide for one or more named fiduciaries of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).  The person named as the "administrator" in the Plan instrument is automatically a named fiduciary, and in the absence of such a designation, the Sponsor is the administrator.  ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

46.      **De Facto Fiduciaries**.  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent:  "(i) he exercises any discretionary authority or discretionary control with respect to management of such Plan[] or exercises any authority or control with respect to management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such Plan[], or has any authority or responsibility to do so, or (iii) he has any

discretionary authority or discretionary responsibility in the administration of such Plan[].''
ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

47.     Each of Defendants was a fiduciary with respect to the Plan and owed fiduciary
duties to the Plan and its participants under ERISA in the manner and to the extent set forth in
the Plan's documents, through their conduct, and under ERISA.

48.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. §
1104(a)(1) to manage and administer the Plan, and the Plan's investments solely in the interest of
the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under
the circumstances then prevailing that a prudent man acting in a like capacity and familiar with
such matters would use in the conduct of an enterprise of a like character and with like aims.

49.     Instead of delegating fiduciary responsibility for the Plan to external service
providers, Bausch & Lomb chose to comply with the requirement of ERISA § 402(a)(1) by
assigning the appointment and removal of fiduciaries to the members of its Board of Directors.
These persons and entities in turn selected Bausch & Lomb officers, employees, and agents to
perform relevant fiduciary functions.

**A.     Bausch & Lomb's Fiduciary Status**

50.     Bausch & Lomb exercised discretionary authority or control with respect to
management and administration of the Plan and/or the management or disposition of the Plan's
assets, and is therefore a fiduciary of the Plan.

51.     Bausch & Lomb through its Board of Directors, appointed, evaluated and
monitored the Administrative and the Investment Committees for the Plan.

52.     Pursuant to the Plan of Delegation of Fiduciary Responsibility ("Plan of Delegation"), significant fiduciary duties were delegated to various departments of Bausch & Lomb, including Human Resources, Accounting, Treasury, Tax and Law departments.

53.     In particular, under the Plan of Delegation, the Treasury Department had the responsibility to "[m]onitor activities with trustees, investment managers, insurance companies and actuaries."

54.     Under the Plan of Delegation, the Human Resources Department had the following duties:

(a)     Plan and design benefits, and develop implementation schedules and with Corporate Treasury, the financial impact statements.

(b)     Communicate benefits, including, but not limited to, plan documents, plan amendments, summary plan descriptions, summary annual reports, material modifications, announcement of new or changed plans, and individual participant statements.

(c)     File summary plan descriptions and material modifications with DOL.

(d)     Develop administrative procedures and coordinate implementation.

(e)     Process distributions from deferred plans.

(f)     Provide retirement education.

(g)     Maintain ERISA records for retired and terminated vested participants.

(h)     Administer all welfare and executive plans.

(i)     Coordinate discrimination testing and assist in preparing [Form] 5500's and file [Form] 5500's.

(j)     Direct payment of benefits.

(k)     Provide information regarding specific claims or benefits.

(l)     Prepare and file reports for the Pension Benefit Guarantee Corporation.

(m)     Monitor and report on all changes by the Department of Labor impacting the plan.

(n)     Assist auditors with annual qualified benefit plan audits.

(o)     Comply with Sarbanes Oxley as it relates to benefit plan.

(p)     Monitor and report on all tax legislation impacting the plan and coordinate any required plan change with outside counsel.

55.     In connection with Bausch & Lomb's announcement on December 22, 2005, that the Company was restating its earnings, the Company exercised fiduciary authority by directing Fidelity to freeze new participant contributions and exchanges in the Fund.   Bausch & Lomb also directed Fidelity to redirect contributions to the Fund to the Fidelity Retirement Government Money Market Portfolio.

56.     Bausch & Lomb also acted as a fiduciary in connection with Plan communications.  Upon information and belief, at all times during the Class Period, Bausch & Lomb's SEC filings were incorporated into and part of the Summary Plan Descriptions ("SPDs"), the Prospectus and/or the Form S-8 registration statements.

57.     Upon information and belief, Bausch & Lomb was responsible for preparing and distributing communications to participants regarding the Plan, including the preparation of (a) the SPDs, (b) the Prospectus, (c) the Form S-8 registration statement, (d) the SEC filings incorporated by reference into the SPDs, the Prospectus and the Form S-8 registration statements and (e) other material related to the Plan.

58.     Bausch & Lomb exercised discretionary authority with respect to the Plan by determining or participating in decisions about the substantive content of (a) the SPDs, (b) the

Prospectus, (c) the Form S-8 registration statements, (d) the SEC filings incorporated by reference into the SPDs, the Prospectus and the Form S-8 registration statements and (e) any other Plan material or communications, all of which were intended to communicate to participants information necessary for participants to manage their retirement benefits under the Plan.

59.     Bausch & Lomb was not required under the Plan to cause the Plan to offer the Fund as an investment option, or to incorporate all of Bausch & Lomb's SEC filings into the Plan documents, but once it elected to do so, it made the disclosures in those documents to the Plan participants in a fiduciary capacity.

60.     Upon information and belief, the designated fiduciaries of the Plan understood that their separate designation as Plan fiduciaries with defined functions under the documents and instruments governing the Plan was, in large measure, a formality, and that in fact decisions concerning the Plan's investments and the extent of disclosures between and among fiduciaries and to participants and beneficiaries were made on a routine basis by Bausch & Lomb's regular chain of command and the Company's employees acting in the regular course of employment with the Company.  By making such decisions through the Bausch & Lomb chain of command rather than in the designated fiduciary committees, Bausch & Lomb became a *de facto* fiduciary of the Plan by, in fact, exercising discretionary authority or control over the Plan's administration and authority or control over management or disposition of its assets.

61.     Bausch & Lomb had, at all applicable times, effective control over the activities of its directors, officers and employees, including over their Plan-related activities.  Through its Board of Directors or otherwise, Bausch & Lomb had the authority and discretion to hire and terminate said officers and employees.  In addition, upon information and belief, the Company

and/or its Board of Directors also had the authority and discretion to appoint, monitor, and remove individual directors, officers and employees from their individual fiduciary roles with respect to the Plan.  By failing to properly discharge their fiduciary duties under ERISA, the director, officer and employee fiduciaries breached duties they owed to the Plan, its participants and their beneficiaries.  Accordingly, the actions of the Board of Directors, the Plan's administrative and/or investment committees and/or any other employee fiduciaries are imputed to the Company under the doctrine of *respondeat superior*, and the Company is liable for these actions.

62.     In particular, Bausch & Lomb personnel participated in (a) appointing and monitoring those who administered the Plan, (b) administering the Plan and Plan assets, (c) monitoring the Plan's investment options and (d) determining the substantive content of Plan communications, including SEC filings that, upon information and belief, were incorporated by reference into the Plan documents.

63.     Further, upon information and belief, through the express and/or implied use of its power to compensate, demote and discharge individuals working for Bausch & Lomb or its subsidiaries, Bausch & Lomb made it clear to all those who both served the Plan in a fiduciary capacity and became aware of the improprieties associated with the Company's financial statements and the risks associated with *ReNu*, that taking any steps on behalf of the Plan, its participants and beneficiaries, or otherwise, that would jeopardize the Company was unacceptable and would lead to dire consequences for such individual, thereby effectively precluding any action  by any designated Plan fiduciary.  Such steps could have included (a) efforts to eliminate or at least limit the Plan's investment in Bausch & Lomb stock, (b) disclosure of the true financial condition of the Company and (c) disclosure of the true health risks

associated with *ReNu*, to fellow fiduciaries who were unaware of them or only partly aware of them, to Plan participants and beneficiaries, and/or to the United States Department of Labor ("DOL").

64.     Consequently, in light of the foregoing duties, responsibilities, and actions, Bausch & Lomb was a *de facto* fiduciary within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that it exercised discretionary authority or discretionary control with respect to management of the Plan, exercised authority or control with respect to management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

**B.     Director Defendants' Fiduciary Status**

65.     As directors of the Company, Defendants Carpenter and Zarrella  had the authority to manage the business and affairs of Bausch & Lomb.  Because Bausch & Lomb, as alleged above, was a fiduciary of the Plan during the Class Period, so, necessarily, its Board members Carpenter and Zarrella.

66.     Under the Plan of Delegation, the Director Defendants held fiduciary responsibilities over each of Bausch & Lomb's employee benefit plans, including the Plan.  The Plan of Delegation provided:

> The fiduciary responsibilities attending employee benefit plans
> imposed by the Employee Retirement Income Security act (sic) of
> 1974 (ERISA) and the New York Business Corporation Law **are
> borne in the first instance by the Board of Directors**.

(Emphasis added).

67.     While the Board delegated certain responsibilities over the Plan to committees and employees of Bausch & Lomb, the Plan of Delegation provided that such duties were

allocated "with the understanding that [their] actual operation and effectiveness will remain **subject to the scrutiny of the Board**." (Emphasis added).

68.     Pursuant to Section 7.1 of the Plan, the Director Defendants had responsibility to appoint and monitor members of the Administrative Committee and the Investment Committee. The Committee members served at the pleasure of the Board and the Board had the authority to appoint, remove and accept the resignation of the committee members.  On information and belief, these committees acted under the direction and control of the Bausch & Lomb Board.

69.     The Director Defendants reserved certain powers and duties over the Plan. Section 7.3. of the Plan provides:

> The [Administrative] Committee shall administer the Plan in accordance with its terms and Shall have all powers necessary to carry out the provisions of the Plan, **except such powers as are specifically reserved to the Board** or some other person.

(Emphasis added).

70.     As part of their duties, the Director Defendants were responsible for monitoring the performance of the investment alternatives in the Plan.  Pursuant to the Plan of Delegation, the Board was responsible for reviewing "reports of committee activities, investment performance and financial status of the plans. . . ," which were prepared periodically for the Board by the Investment Committee.

71.     In addition, pursuant to Section 7.9 of the Plan, the Board maintained the power to "designate persons including committees, other than named fiduciaries to carry out fiduciary responsibilities (other than trustee responsibilities as defined in section 405(c)(3) of the Employee Retirement Income Security Act of 1974) under the Plan."

72.     Each Bausch & Lomb Director Defendant also exercised his discretionary authority with respect to the Plan by determining or participating in decisions about the

substantive content of Bausch & Lomb's SEC filings, which, on information and belief, were incorporated by reference into the SPDs, Prospectus and Form S-8 registration statements.  Such filings were intended to communicate to participants information necessary for participants to manage their retirement benefits under the Plan.

73.     Consequently, in light of the foregoing duties, responsibilities, and actions, the Director Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period, in that they exercised discretionary authority or discretionary control with respect to management of the Plan, exercised authority or control with respect to management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan, including the appointment, removal and monitoring of the Administrative and Investment Committees.

**C.     The Administrative Committee Defendants' Fiduciary Status**

74.     The Administrative Committee was the named fiduciary and administrator of Plan.  The Plan's Trust Agreements with Northern Trust and with Fidelity also confirmed that members of the Administrative Committee were the named fiduciaries of the Plan.

75.     Pursuant to Section 7.1 of the Plan, the Administrative Committee was appointed by the Board "to control and manage the operations and administration of the Plan."

76.     As set forth in the Plan of Delegation, the Administrative Committee had direct fiduciary responsibility over the Plan.

77.     With respect to the selection and review of investments for the Plan, the Administrative Committee had the responsibility to "[r]eview reports of the Investment Committee presented to the Board."

78.     In the Trust Agreement with Fidelity, the Administrative Committee and the Investment Committee were defined as "Named Fiduciaries."   Pursuant to that Agreement, the Administrative Committee – as a "Named Fiduciary" – had the responsibility to "continually monitor the suitability of acquiring and holding Sponsor [Bausch & Lomb] Stock under the fiduciary duty rules of section 404(a) of ERISA."

79.     The Administrative Committee's fiduciary responsibilities also included the following:

(a)     Periodically review procedures necessary to insure that all of the Company's ERISA employee benefit plans are being administered in accordance with the terms of each plan and applicable laws.

(b)     Prepare periodic reports of committee activities to the Board.

(c)     Prior to implementation, the Committee shall review design changes to the plans or financial decisions impacting the plans which will affect the administration of the plan(s).

80.     During the Class Period, Defendant Resnick signed the Plan's Annual Reports on Form 5500 for the years 2000, 2001, 2002 and 2003.  Defendant Rivera signed the Annual Reports on Form 5500 for the years 2004 and 2005.

81.     During the Class Period, the Plan's Annual Reports on Form 5500 for the years 2004 and 2005 indicated that the Plan Administrator was the Bausch & Lomb Employee Benefits "Administration" Committee.

82.     Defendant Rivera signed the Plan's annual reports for the years 2004 and 2005 on behalf of the Plan Administrator, the Bausch & Lomb Employee Benefits "Administration"

Committee.  On information and belief the Bausch & Lomb Employee Benefits

"Administration" Committee was that same entity as the Administrative Committee.

83.     Defendant Nachbar signed the Plan's annual reports on Form 11-K at least for the

years 2002-2006.

84.     Consequently, in light of the foregoing duties, responsibilities, and actions, the

Administrative Committee Defendants were both a named fiduciaries of the Plan pursuant to

ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and a *de facto* fiduciary within the meaning of

ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or

discretionary control with respect to management of the Plan, exercised authority or control with

respect to management or disposition of the Plan's assets, and/or had discretionary authority or

discretionary responsibility in the administration of the Plan.

**D.      Investment Committee Defendants' Fiduciary Status**

85.     The Investment Committee Defendants were named fiduciaries of the Plan "with

respect to the control and management of the assets of the Plan."  *See* Plan, Section 7.2.   The

Plan's Trust Agreements with Northern Trust and with Fidelity also confirmed that the

Investment Committee was a named fiduciary of the Plan.  As set forth in the Trust Agreement

with Northern Trust Company, as of September 1, 1988 (the "Northern Trust Agreement"), the

Investment Committee, "shall be deemed for purposes of ERISA to be [the] named fiduciary for

Plan investments."

86.     Pursuant to Section 7.1 of the Plan, the Investment Committee was appointed by

the Board.

87.     Under the Plan of Delegation, the Investment Committee had direct fiduciary

responsibility over the Plan, which included the following duties:

(a)     Appoint and remove trustees, insurance companies, investment managers, and others who are responsible for the investment, custody or reporting valuation of employee benefit funds.

(b)     Monitor the investment and administrative performance of the insurance companies, trustees, and investment managers.

(c)     Develop investment guidelines for funded benefit plans assets and compare against actual performance.

(d)     Review actuarial asset valuation and investment return assumptions.

(e)     Monitor investment compliance with ERISA.

(f)     Prepare periodic reports of committee activities, investment performance, and financial status of plans for the Board.

88.     Pursuant to the Trust Agreement with Fidelity, as "Named Fiduciaries," the Investment Committee and the Administrative Committee had the responsibility to "continually monitor the suitability of acquiring and holding Sponsor [Bausch & Lomb] Stock under the fiduciary duty rules of section 404(a) of ERISA."

89.     The Northern Trust Agreement also provided that the Investment Committee had the responsibility in connection with the Plan's retention and purchase of Company Stock.  The Northern Trust Agreement stated:

> The Investment Committee shall have the sole investment responsibility with respect to the **retention, sale, purchase** or voting of any Company stock which has not been allocated to a Separate Account . . . .

(Emphasis added).

90.     Consequently, in light of the foregoing duties, responsibilities, and actions, the Investment Committee Defendants were both named fiduciaries of the Plan pursuant to ERISA §

402(a)(1), 29 U.S.C. § 1102(a)(1), and a *de facto* fiduciaries within the meaning of ERISA §

3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary

control with respect to management of the Plan, exercised authority or control with respect to

management or disposition of the Plan's assets, and/or had discretionary authority or

discretionary responsibility in the administration of the Plan.

## FACTS BEARING ON FIDUCIARY BREACH

91.     Bausch & Lomb describes itself as a world leader in the development,

manufacture and marketing of eye health products.  Bausch & Lomb offers its products in five

categories: contact lens, lens care products, ophthalmic pharmaceuticals, cataract and

vitreoretinal surgery and refractive surgery.  The contact lens product category includes

replacement and daily disposable, multifocal, continuous wear, and toric soft lenses, and rigid

gas permeable lenses and materials.  The lens care product category comprises multipurpose

solutions, enzyme cleaners, and saline solutions.

## Bausch & Lomb's Misleading Financial Reporting and Lack of Internal Controls

92.     As more fully set forth below, at least by the beginning of the Class Period,

Defendants routinely failed to implement and adhere to adequate and proper internal control,

disclosure and financial reporting procedures.  As a result, there were widespread and pervasive

financial and accounting reporting deficiencies at several of Bausch & Lomb's subsidiaries

which adversely impacted the Company's overall operations and financial performance.

Furthermore, the systemic breakdown of internal controls and financial reporting caused the

Company to issue incomplete, inaccurate and materially misleading information to Plaintiffs and

other Plan participants, and the public at large, about the Company's financial performance by

making it appear more profitable than it was, which in turn caused artificial inflation of the

Company's stock price and the price of Fund shares.  Because the price of the Fund shares was artificially inflated, investment in the Fund during the Class Period was imprudent.

93.     Throughout the Class Period, the Company issued financial reports that violated Generally Accepted Accounting Principles ("GAAP").  Once the scope of Defendants' misconduct became public, the price of the Company's stock declined and depleted Plaintiffs' and other Plan participants' retirement savings that were invested in the Fund.

94.     Throughout the Class Period, Defendants issued materially inaccurate and misleading financial statements and representations regarding the effectiveness of the Company's internal control, disclosure and financial reporting procedures.  This information was provided to Plaintiffs and other Plan participants in Plan communications, including but not limited to, filings with the United States Securities and Exchange Commission ("SEC") that were incorporated by reference into Plan documents.

**A.     Bausch & Lomb's Financial Statements Were Materially Inaccurate**

95.     During the Class Period and the quarter immediately prior to the beginning of Class Period, the Company reported its net income as follows:

- The Form 10-Q for the quarter ended March 25, 2000, filed on May 4, 2000, reported net income of $39.1 million

- The Form 10-K for the fiscal year ended December 30, 2000, filed on March 28, 2001, reported net income of $83.4 million;

- The Form 10-K, for the fiscal year ended December 29, 2001, filed March 22, 2002, reported net income of $21.1 million;

- The Form 10-K, for the fiscal year ended December 28, 2002, filed March 21, 2003,  reported net income of $72.5 million.

- The Form 10-K for year ended December 27, 2003, filed August 3, 2004, reported net income of $125.5 million.

•       The Form 10-K for year ended December 25, 2004, filed March 9, 2005, reported net income of $159.6 million.

96.     The Company also made numerous disclosures regarding the adequacy of its internal controls.  In fact, Defendants Zarrella and McCluski signed statements in connection with the 2002, 2003 and 2004 10-Ks that attested to the adequacy of the Company's financial controls.

97.     On March 8, 2004, the Company filed its 2003 Annual Report, in which it confirmed the Company's previously announced financial results and as noted above attested to the effectiveness of the Company's internal and disclosure controls.  In particular, Bausch & Lomb's 2003 Form 10-K, reported in pertinent part that, "the Company's Chairman and Chief Executive Officer and the Company's Senior Vice President and Chief Financial Officer have concluded that as of the end of the period covered by this report, the Company's disclosure controls and procedures were effective in timely alerting them to material information relating to the Company (including its consolidated subsidiaries) required to be included in the Company's periodic filings with the [SEC]."  The Company further reported that, "[t]here were no changes in the Company's internal control over financial reporting . . . that materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting."

98.     The Company's 2004 Form 10-K reiterated the Company's representations regarding the effectiveness of its disclosure controls and procedures.  The Company also outlined its internal control procedures, which were intended to maintain reasonably detailed and accurate records regarding the disposition of assets,  provide reasonable assurance that transactions are recorded to enable the preparation of financial statements in accordance with generally accepted accounting principles, and provide reasonable assurance of the Company's measures to prevent

and timely detect the unauthorized acquisition, use or disposition of Company assets that could materially affect its financial statements.

99.     However, in or about October 2005, Bausch & Lomb began reporting a series of partial announcements regarding accounting and management improprieties at the Company. Ultimately, these announcements led to Bausch & Lomb's admission that its financial reporting during the Class Period was materially false and misleading.

100.    On October 26, 2005, Bausch & Lomb filed a Form 8-K with the SEC in which it announced that "it may **delay the filing of its Quarterly Report** on Form 10-Q . . . pending the results of an investigation . . . into allegations of improper conduct by management of the Company's Brazilian subsidiary, BL Industria Otica, Ltda. ("BLIO"), and past tax assessments against BLIO by Brazilian taxing authorities."

**B.      Improprieties at the Brazilian subsidiary, BLIO**

101.    As part of the October 26, 2005 press release attached to the 8-K, Bausch & Lomb disclosed that the general manager, the controller and other employees of BLIO engaged in improper management and accounting practices, including among other things, (a) the mischaracterization of expenses to fund an unauthorized local pension arrangement for the benefit of themselves and other members of local management, (b) the avoidance of Brazilian payroll tax obligations, which resulted in tax assessments against BLIO for unpaid taxes totaling approximately $5 million, interest of approximately $7 million, plus approximately $21 million in claimed penalties relating back to earlier periods and (c) the  misuse of Company assets for personal benefit.

102.    On November 3, 2005, Bausch & Lomb filed a Notification of Late Filing on Form 12b-25 with the SEC, which was signed by Defendant McCluski, and indicated that the

Company was delaying the filing of its Form 10-Q to "allow for the Audit Committee's independent investigation."

103.    Thereafter on November 29, 2005, Bausch & Lomb filed a Form 8-K with the SEC, signed by Defendant McCluski, which disclosed that the Audit Committee investigation was continuing.

104.    On December 22, 2005, Bausch & Lomb filed with the SEC a Current Report on Form 8-K providing an update on the investigation of improper conduct by management of its Brazilian subsidiary.  Based on its investigation, Bausch & Lomb concluded that certain prior period financial statements would be required to be restated, including fiscal years ending 2000, 2001, 2002, 2003, 2004 and the first and second quarters of 2005.  The Company also stated that its Annual Report on Form 10-K for the year ended December 25, 2004; Quarterly Report on Form 10-Q for the quarterly period ended March 26, 2005; and Quarterly Report on Form 10-Q for the quarterly period ended June 25, 2005 "should no longer be relied upon."

105.    In the Form 8-K filed on December 22, 2005, Bausch & Lomb also revealed a material weakness relating to the detection and prevention of management fraud causing the override of existing controls leading ultimately to the identification and resolution of certain tax accounting matters with respect to BLIO.

C.    **Improprieties at the Korean Subsidiary, BL Korea**

106.    In its December 22, 2005 Form 8-K, Bausch & Lomb further revealed that in late November 2005, the Audit Committee commenced an independent investigation into revenue recognition practices in its Korean subsidiary, BL Korea, and that the SEC had been notified of this investigation.

107.     Thereafter, on March 17, 2006, the Company filed a form 12b-25 with the SEC indicating that would continue to delay the filing of its 10-K.  According to Bausch & Lomb's own statements, "the Korea investigation has found evidence that from 2002 to 2005, BL Korea engaged in improper vision care-related sales practices in violation of Company policies.  In light of that evidence, the Company has preliminarily determined that, pursuant to generally accepted accounting principles, all BL Korea vision care transactions for this period should be recorded under consignment accounting rules which only recognize revenue upon payment by the customer."

108.     The statement further provided that "the Company currently expects that its previously reported expected restatement of prior period financial statements also will include revenue recognition adjustments for vision care sales in Korea from 2002 to 2005 using consignment sales accounting."  Ultimately, Bausch & Lomb estimated the "unaudited impact of these adjustments would reduce the Company's previously reported net sales for the first and second quarters of 2005 by a cumulative total of approximately $1.4 million and reduce the previously reported net sales for the period 2002 through 2004 by a cumulative total of approximately $7.9 million."

109.     Upon the disclosure of this adverse information, the price of Bausch & Lomb stock declined by approximately 15% over the following four trading sessions on very heavy volume.

110.     On March 17, 2006, Bausch & Lomb also reported "while work with respect to these adjustments has not yet been finalized, the Company currently estimates the unaudited impact of these adjustments would be to reduce the Company's previously reported net sales for the first and second quarters of 2005 by a cumulative total of approximately $1.4 million and to

reduce the previously reported net sales for the period 2003 to 2004 by a cumulative total of approximately $1.9 million."

111.    Bausch & Lomb also stated it had "undertaken expanded procedures with respect to assessing deferred income tax balance sheet accounts, which the Company expects will result in additional adjustments to prior period financial statements covered by the expected restatement."

### Bausch & Lomb Restates Its Financials

112.    On February 7, 2007, after significant delay, Bausch finally filed its 10-K for the fiscal year 2005.  As part of that 10-K filing, the Company restated its consolidated financial statements for fiscal years 2003 and 2004 and restated selected financial data for fiscal years 2002, 2001 and for periods prior to 2001.  The restatement included the retained earnings impact for misstated financial accounting occurring in periods prior to 2001.

113.    In the 2005 10-K, Bausch & Lomb admitted that its financial reporting during the Class Period was materially false and misleading.  Furthermore, the Company admitted that widespread, systemic internal control deficiencies and accounting malfeasance took place during the Class Period.

114.    Concerning its Class Period financial statements, Bausch & Lomb represented that

•    its fiscal 2001 net income was overstated by more than 35% of what was initially reported;

•    its fiscal 2002 net income was overstated by more than 35%  of what was initially reported;

- its fiscal 2003 net income was overstated by more than 18% of what was initially reported;

- its fiscal 2004 net income was overstated by approximately 4% of what was initially reported;

- its net income for the quarter ended March 31, 2005 was overstated by approximately 4% of what was initially reported; and

- its net income for the quarter ended June 30, 2005 was overstated by more than 20% of what was initially reported.

115.   For periods prior to 2001, Bausch & Lomb negatively adjusted retained earnings by $7 million dollars as a result of $4.4 million in improper revenue recognition and $2.6 million in improper accounting of certain Brazil matters.   This decrease was offset against increases to retained earnings.

116.   The 2005 10-K further confirmed the extent of the breakdown of its internal control, disclosure and financial reporting relative to its BLIO operations (dollars in millions). As a result of the Company's Audit Committee investigation, "the Company learned that the general manager, the controller and other employees of BLIO, in violation of Company policies, engaged in improper management and accounting practices."   These improper practices lead to the assessment by Brazilian tax authorities of $33 million in unpaid taxes, interest and penalties relating back to various earlier periods.

117.   According to the Company's 2005 Form 10-K, the Audit Committee investigation revealed the Company's failure "to comply with certain local payroll tax obligations and also mischaracterized approximately $0.6 in expenses to fund an approximately $1.5, unauthorized local pension arrangement for the benefit of the general manager, the controller and other

members of local management." Based on the Company's review of these matters, it was

determined that the cumulative after tax charges in periods prior to 2003 through the first half of

2005 of approximately $27 million were appropriate.

118.    The Company's 2005 Form 10-K also confirmed the existence of material

weaknesses in Bausch & Lomb's internal control procedures:

> Management conducted an assessment of the effectiveness of the
> Company's internal control over financial reporting as of December 31,
> 2005 based on the criteria established in Internal Control - Integrated
> Framework issued by the Committee of Sponsoring Organizations of the
> Treadway Commission (COSO).
>
> * * *
>
> In connection with the assessment described above, management has
> identified the following material weaknesses as of December 31, 2005:
>
> (1)    The Company did not maintain an effective control environment . .
> . [;] . . .
>
> (2)    [T]he Company did not maintain effective controls to ensure that
> account reconciliations and journal entries were supported by
> appropriate analysis and documentation in connection with the
> financial reporting and close process. . . . [;and]
>
> (3)    The Company did not maintain effective controls over certain
> subsidiaries' relationships with their key distributors, particularly
> in the Company's Korea, Japan and India subsidiaries, and did not
> maintain effective controls over the installation of refractive laser
> surgery equipment in multiple locations where the Company does
> business, to ensure that revenue associated with such distributor
> and laser sales was recognized in accordance with GAAP. . . .

119.    As part of its restatement, the Company admitted to the scope of the breakdown

of its internal control, disclosure and financial reporting relative to its other Asian subsidiaries

and operations (dollars in millions):

> As a result of the Audit Committee's independent investigation, the Company
> determined that from 2002 to 2005 sales management at BL Korea, in violation of
> the Company's policies, engaged in improper vision care-related sales practices
> including, at various times, granting customers improper rights to return product,

facilitating product exchanges between customers without properly accounting for such exchanges, failing to properly process product returns and granting excessive credit.

****

The Company's restatement of prior-period financial statements includes additional adjustments relating to revenue recognition for the following matters: the BL Korea vision care sales discussed previously; certain refractive laser sales; certain vision care transactions with a single distributor in Thailand; vision care transactions with two large distributors in Japan; vision care and cataract transactions with the distributor network in India; and the improper handling of certain sales related reserves in China. Of these adjustments, the largest relates to the vision care transactions in Japan which reduced net sales in periods prior to 2003 through the first six months of 2005 by a cumulative total of $12.3 and reduced net earnings by a cumulative total of $5.3. The revenue recognition adjustments for vision care sales in Korea from periods prior to 2003 through the first half of 2005 reduced net sales by a cumulative total of $8.4 and reduced net earnings by a cumulative total of $3.3. All other revenue recognition matter adjustments prior to 2003 through the first six months of 2005 in the aggregate reduced net sales by a cumulative total of $6.7 and reduced net earnings by a cumulative total of $2.5.

* * *

Other Items.  In the course of completing the Audit Committee's previously discussed BL Korea investigation, evidence was discovered that indicated managers in the Company's Asian operations improperly recorded reserve account entries. . . . As a result, the Company has recorded in its financial statements from periods prior to 2003 through the first six months of 2005 cumulative adjustments to net earnings of less than $1 in the aggregate, all of which relate to the Asia Region, for Japan subsidiary litigation reserves and other Asia business-related reserves. In addition, the Company reviewed all significant accounting entries, including out-of-period adjustments, made in the periods covered by the restatement and determined that a number of adjustments were not in accordance with GAAP or belonged in different quarterly periods within the restated periods. The largest of these adjustments related to the reversal of approximately $13.5 of currency translation adjustments (CTA) which had been released to income upon liquidation of certain of the Company's subsidiaries. These transactions should have been viewed as a change in functional currency, rather than as a liquidation. . . .  [Emphasis added.]

33

120.    Thus, Bausch & Lomb's 2005 Form 10-K, filed February 7, 2007, effectively admitted that the Company's prior representations about its internal and disclosure controls were materially false and misleading when made during the Class Period.

121.    In sum, Bausch & Lomb has acknowledged its internal control deficiencies during the Class Period were systemic and included, among others:

- A failure to establish and maintain effective corporate and regional management oversight;

- A failure to monitor the actions of its subsidiaries' managements;

- A failure to employ sufficient personnel with an appropriate level of knowledge, experience and training in internal audit;

- A failure to employ sufficient personnel with an appropriate level of knowledge, experience and training in the application of income tax accounting;

- A failure by senior management to maintain an ethical environment;

- A failure to review and approve new employee benefit plans;

- A failure to adequately review customer sale arrangements;

- An ineffective program to prevent and detect employee fraud;

- An ineffective quarterly financial reporting and close process;

- A failure to ensure that account reconciliations and journal entries were supported by appropriate analysis and documentation;

- Ineffective controls over accounting reserves;

- Ineffective subsidiary/distributor controls;

- Ineffective controls associated with revenue recognition, including controls governing the documentation and terms of sale;

- Ineffective accounts receivable accuracy and valuation controls;

- Ineffective distributor inventory controls;

- Ineffective sales order, sales return and product exchange controls;

- Ineffective credit limit, credit term, and product discounting controls; and

- Ineffective equipment installation controls.

122.    The above facts depict widespread corporate malfeasance and concomitant fiduciary misconduct while Defendants repeatedly misled Plaintiffs and Plan participants regarding the integrity of Bausch & Lomb's financial reporting.

123.    By restating its previously issued financial statements, B&L has made the determination that much financial statements were materially misstated because GAAP, in FASB's Statement of Financial Accounting Standards ("SFAS") No. 154, provides that only materially misstated financial statements may be retroactively restated

124.    GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.  Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  (emphasis added).  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual financial statements.

125.    Pursuant to GAAP, as set forth in Accounting Principles Board Opinion ("APB") No. 20, the type of restatements and revisions announced by Bausch & Lomb were to correct for material errors in previously issued financial statements.  APB No. 20, Tv 7-13.  However, the

restatement of past financial statements is a disfavored method of recognizing an accounting change as it dilutes confidence of investors in the financial statements, it makes it difficult to compare financial statements, and is often difficult, if not impossible, to generate the numbers when restatement occurs.  Id., II 14.  Thus, GAAP provides that financial statements should only be restated in limited circumstances, i.e., when there is a change in the reporting entity, there is a change in accounting principles used, or to correct an error in previously issued financial statements.

126.    Bausch & Lomb's restatements and revisions were not due to a change in reporting entity or a change in accounting principles, but rather to correct errors in previously issued financial statements.  As such, the restatements and revisions were an admission by Bausch & Lomb that its previously issued financial results and its public statements regarding those results were false and misleading.

127.    Indeed, immaterial corrections are not required to be restated.  Thus, Bausch & Lomb's restatements indicate that the errors were therefore necessarily material.

128.    Upon information and belief, Bausch & Lomb, the Director Defendants (as well as the Audit Committee of the Board of Directors, and the Company's high-ranking officer(s)) had knowledge of the control weaknesses, inaccurate and unlawful financial reporting, and improper management practices at least as early as beginning of the Class Period and failed to provide this material information to Plan participants or correct the ongoing misconceptions about the financial health and reporting of the Company and its problematic internal controls.

129.    As a result of the materially false and misleading statements and accounting improprieties, Bausch & Lomb's securities were inflated during the Class Period.  The Plan, Plaintiffs and other Plan Participants purchased or otherwise acquired and held interests in the

Fund relying upon the integrity of the market price of the stock and market information relating to Bausch & Lomb, and have been damaged thereby.

**Defendants' Concealment of Serious Eye Infections**
**Linked to The Company's *ReNu* Products**

130.    *ReNu* brand multipurpose contact lenses solutions are among Bausch & Lomb's flagship products.  As set forth below, Defendants' public statements about the Company's financial results and prospects during the Class Period repeatedly attributed  the strong sales of *ReNu* solutions to the growth of the Company's Lens Care segment's revenues and its forecasted continued growth.

131.    Defendants also publicly stated that *ReNu* was safe, provided excellent disinfection.  In fact, as set forth below, *ReNu* solutions were associated with an unusually high incidence of serious eye infections known as "Fusarium keratitis."  However, Defendants did not disclose this information to the Plan and its participants and contact-lens wearers until April 10, 2006, and even then concealed the truth about the link between *ReNu* and Fusarium Keratitis, which was not disclosed until May 3, 2006.

132.    As a result of the serious injuries caused by Bausch & Lomb's *ReNu* product, as of April 19, 2007 the Company has been named as a defendant in approximately 344 product liability lawsuits pending in various federal and state courts as well as certain other non-U.S. jurisdictions related to injuries from *ReNu*.

133.    According to the U.S. Food & Drug Administration ("FDA"), Fungal keratitis is a severe infection of the cornea caused by the Fusarium fungus.  Patients who do not respond to antifungal medications can experience vision loss, which usually requires surgical intervention, including corneal transplants.

134.    Instead of promptly disclosing these problems, Defendants repeatedly described the importance of *ReNu* to the Company and concealed the risks associated with the *ReNu* products.

135.    During the Company's July 29, 2004 earnings conference call, Defendant Zarrella described the importance of Bausch & Lomb's *ReNu* line as follows:

> Our ReNu line of multi-purpose solutions continues to lead the chemical category in the U.S. market, and our position **should be strengthened further when we introduce our next generation product, Renu with MoistureLoc in September**. We received FDA clearance and European CE market approval in May for this new patented solution, which retains moisture, reduces irritating deposits and **provides excellent disinfection**. This is the first multi-purpose produce with a labeling claim approved by the FDA that provides sustained comfort and may help improve comfort for patients experiencing contact lens dryness, one of the leading causes of dropouts.

> We previewed ReNu with MoistureLoc at the annual American Optometric Association Congress last month, and the response from the trade was very enthusiastic. We'll launch the produce in the U.S. in September, to be followed by Europe and Asia over the rest of the year.

> Our European lens care revenues were up 1% in the quarter, but were down 4% ex-currency, with declines in older technology cleaning regimens like salines, more than offsetting gains in multi-purpose solutions. **The strength of the ReNu franchise has allowed us to remain the market leader in multi-purpose solutions in the region**.

> In Asia, lens care revenues increased 12%, and were up 7% without currency. This growth reflected continued share gains by our original formula ReNu solution in Japan, as well as the success of consumer advertising campaigns in China and Korea, **emphasizing the superiority of multi-purpose solutions, in general, and the Renu brand, in particular**.

(Emphasis added).

136.    On March 9, 2005, the Company filed with the SEC its Form 10-K for the fiscal year ended December 25, 2004 (the "FY 2004 Form 10-K"). In its FY 2004 Form 10-K,

Defendants described the importance of the *ReNu* product line to the Company's growth

strategy:

> Lens Care - **Revenues from lens care products constituted 23% of our total revenues** in fiscal year 2004, growing 5% from 2003 (or 2% excluding the effect of currency).
>
> **We are the global leader in market share for lens care products**. Our strategy is to outpace market trends and increase our share through continued leadership in the multi-purpose segment, the only growing category in the overall lens care market. **Our flagship brand, ReNu, has the leading market position in this segment** in the U.S. and our Boston brand of products for RGP lens care holds a commanding market share worldwide. **In the third quarter of 2004, we introduced ReNu with MoistureLoc, an all-new multi-purpose solution in the U.S. and Europe. This is the first multipurpose product with a labeling claim approved by the U.S. Food and Drug Administration (FDA) indicating that it provides sustained comfort and may help improve comfort for patients experiencing contact lens dryness -- one of the leading causes of contact lens dropouts. We will expand the availability of ReNu with MoistureLoc into Asian markets in 2005, as well as launch ReNu MultiPlus in Japan.**

(Emphasis added).

137.    Defendants also highlighted in the Company's FY 2004 Form 10-K the

importance of the *ReNu* line to the Company's future financial performance:

> In the lens care category, the Company is projecting growth of between two and four percent, reflecting the continued roll-out of ReNu with MoistureLoc solution into additional markets and the launch of ReNu MultiPlus solution in Japan anticipated in the second quarter. ReNu MultiPlus will be the only multi-purpose solution in Japan that eliminates the need for a separate weekly enzyme treatment to remove protein deposits. The Company expects the launch of ReNu MultiPlus solution to help increase its overall share position in the multi-purpose segment of the Japanese lens care market.

138.    The FY 2004 Form 10-K also stated in relevant part:

> In the lens care category, constant-currency net sales gains [in FY 2003 over FY 2002] in the Americas and Asia offset modest

39

declines in Europe, with overall growth resulting from gains in the *ReNu* brand of multi-purpose solutions.

\* \* \*

Lens care net sales in the Americas increased 5% in both actual dollars and in constant currency [in FY 2003 over FY 2002]. This growth reflected the continued strength of the Company's ReNu brand of lens care products. The Company increased its U.S. market share position in 2003 as evidenced by fourth-quarter independent syndicated market survey information, combined with inventory data available from warehouse clubs and a large retail outlet which indicated consumption had surpassed the Company's rate of shipment.

\* \* \*

In Asia, lens care revenue increased 11% and 6% in actual dollars and in constant currency, respectively [in FY 2003 over FY 2002], led by the strength of the Company's ReNu brand which continued to lead the lens care market in the region. This position was bolstered through direct-to-consumer messaging about the benefits of chemical disinfectants in several key geographies during 2003.

\* \* \*

Lens care net sales in the Americas increased 1% in both actual dollars and in constant currency [in FY 2004 over FY 2003]. The Company continues to maintain its leading market position in the U.S. lens care market in both multi-purpose and rigid gas permeable solutions. Additionally, the Company introduced its next-generation product, ReNu with MoistureLoc solution in the third quarter of 2004. This newly patented solution provides sustained comfort. It is the first multi-purpose product with a labeling claim approved by the FDA that it may improve comfort for patients experiencing contact lens dryness, which is a leading cause of discontinued lens wear.

\* \* \*

In Europe, lens care product net sales increased 9% in actual dollars and were flat on a constant-currency basis [in FY 2004] compared to 2003. The overall European lens care market had experienced declines through the third quarter, primarily related to older technology regimens. ReNu with MoistureLoc solution was launched in limited markets during the third quarter and by the end of the fourth quarter, the product was available in all major markets in the region. Sales of the ReNu line of multi-purpose solutions grew approximately 20% in the fourth quarter over the prior year fourth quarter. The Company believes the fourth-quarter lens care improvement was a result of strong market acceptance of

ReNu with MoistureLoc solution as evidenced by positive
feedback from practitioners and their patients.

In Asia, revenues for the year increased 9% in actual dollars and
5% in constant currency [in FY 2004 over FY 2003] mainly on the
strength of multi-purpose solutions, which grew 8% for the year.
The Company launched ReNu with MoistureLoc solution in Hong
Kong, Singapore and Malaysia during the fourth quarter and the
Company believes the response from the trade was very
encouraging.  The Company plans to launch ReNu with
MoistureLoc solution in other key markets in Asia as regulatory
approvals are received.

139.    On April 28, 2005, the Company filed with the SEC its Form 10-Q for the

quarterly period ended March 26, 2005 (the "2005 1Q Form 10-Q").  In the 2005 1Q Form 10-Q,

Defendants again positively promoted the *ReNu* line of products:

For the first quarter, lens care net sales in the Americas increased
17 percent in both actual dollars and constant currency, reflecting a
very significant order from the Company's largest retail customer
in advance of a major consumer promotion.  This promotion,
initiated by the customer, featured prominent displays of ReNu
branded products at a significant number of stores.  The Company
believes some portion of the sales associated with the order are
incremental to its expectations for the lens care category for 2005,
but the majority represented a shift in sales from the second quarter
into the first quarter.  The launch of ReNu with MoistureLoc has
allowed the Company to increase its market share position.
According to third-party market data, which does not include data
from Wal-Mart or the warehouse clubs, the Company has
increased its unit share of the chemical segment by more than two
points as compared to a year ago.

* * *

In Europe, lens care product net sales increased nine percent in
actual dollars in the first quarter of 2005 over the same quarter in
2004, or five percent in constant currency.  Gains were primarily
due to the Company's lines of multi-purpose solutions, which grew
more than five percent in an essentially flat market.  Rapid growth
of ReNu with MoistureLoc reflects the Company's successful
consumer marketing programs, as well as increased distribution.
The most recent market data indicate that the Company has gained
market share in the multi-purpose segment of the European lens
care market.

140.     That 2005 1Q Form 10-Q also stated in relevant part:

>    In Asia, lens care net sales increased eight percent in actual dollars
>    and excluding the impact of currency, increased five percent.
>    Increases were attributable to a 15 percent gain in sales on multi-
>    purpose solutions.  During the first quarter of 2005, the Company
>    launched ReNu MultiPlus solution in Japan.  Although it is a
>    generation behind ReNu with MoistureLoc, it is the most
>    technologically advanced product available in the Japanese market,
>    and its differentiated claims have been well received by the trade.
>    Outside of Japan, sales growth was driven by ReNu with
>    MoistureLoc.

141.     By at least July 2005, Bausch & Lomb was informed about complications

associated with *ReNu with MoistureLoc* and Fusarium keratitis when health officials at both the

Hong Kong Hospital Authority and the Singapore Ministry of Health ("SMOH") voiced concern

about "unusually high" incidences of Fusarium keratitis.  Shortly thereafter, in August 2005, the

Hong Kong Department of Health ("HKDH") began investigating contact lens-related eye

infections after patients at public hospitals were reported to be suffering from microbial keratitis.

142.     In October, 2005, officials from the HKDH requested that Bausch & Lomb

conduct an investigation to determine whether a causal relationship existed between its *ReNu*

products and keratitis, and informed Bausch & Lomb that health officials had observed a rising

trend of keratitis by users of *ReNu*.  The FDA has determined that Bausch & Lomb received

complaints about keratitis from the SMOH in July 2005.

143.     After Bausch & Lomb failed to respond to the HKDH's October 20, 2005

notification, health officials at the HKDH issued a second formal notice to Bausch & Lomb

about a potential link between the outbreak of keratitis and *ReNu with MoistureLoc* on

November 11, 2005.

144.     Upon receiving this second formal notification, Bausch & Lomb, according to an

April 27, 2006, *Bloomberg* article, sent a report dated November 13, 2005 to the FDA stating

that twenty-five *ReNu* users in Hong Kong developed Fusarium keratitis. According to *Bloomberg*, and eventually admitted by Bausch & Lomb, while Bausch & Lomb's report was dated November 13, 2005, it inexplicably was not sent to the FDA until December 2005.

145. Although Bausch & Lomb's belated report to the FDA indicated that there was an outbreak of keratitis in Hong Kong, the report did not indicate that the HKDH formally placed Bausch & Lomb on notice of a potential link between the outbreak and *ReNu* or that the HKDH requested Bausch & Lomb to conduct an investigation to determine whether a causal relationship existed between *ReNu* products and keratitis.

146. On July 28, 2005, the Company filed with the SEC its Form 10-Q for the quarterly period ended June 25, 2005 ("2005 2Q Form 10-Q"). In the statements about the Company's financial results for the second quarter of 2005, Defendants reported that the Lens Care segment's actual revenue increased 3% and constant-currency revenue increased 1% over the second quarter of 2004 and stated: "Lens care sales growth was led by the Company's lines of all-in-one solutions for both soft and rigid gas permeable contact lenses. Gains in Europe and Asia were partially offset by a one-percent decline in the Americas region that reflected the previously disclosed timing of a major U.S. customer's promotion that shifted sales from the second quarter into the first. First-half lens care sales in the Americas were up seven percent (six percent in constant currency), and reflected continued market acceptance and share gains for ReNu® with MoistureLocTM multi-purpose solution." Further, the 2005 2Q Form 10-Q stated in relevant part:

> Growth for the first six months of 2005 was driven by share gains attributable to the Company's ReNu with MoistureLoc brand of multi-purpose solutions. Based on the most recent syndicated data, the total ReNu franchise gained nearly two unit share points in the second quarter.

* * *

43

For the quarter, lens care net sales in the Americas decreased one percent in actual dollars and two percent in constant currency, but increased seven percent in actual dollars (six percent in constant currency) year-to-date.  Second-quarter lens care net sales declined primarily due to an expected moderation in performance given that a major U.S. retailer ran a very large promotional program of the Company's ReNu branded products in the first quarter and essentially shifted sales from the second quarter.  Growth for the first six months of 2005 was driven by share gains attributable to the Company's ReNu with MoistureLoc brand of multi-purpose solutions.  Based on the most recent syndicated data, the total ReNu franchise gained nearly two unit share points in the second quarter."

* * *

In Europe, lens care product net sales increased 12 percent in the second quarter of 2005 over the same quarter in 2004 and eight percent in constant currency.  Year-to-date net sales increased 10 percent and seven percent in constant currency compared to the same period in 2004.  The Company continues to gain share in the Europe region on the strength of ReNu with MoistureLoc, which drove overall multi-purpose solutions growth of more than 10 percent in the second quarter."

* * *

In Asia, lens care net sales in the quarter increased six percent in actual dollars and two percent in constant currency while year-to-date sales were seven percent higher in actual dollars (three percent in constant currency) over the comparable period in 2004.  Increases were attributable to gains in sales of multi-purpose solutions reflecting the Company's launch of ReNu MultiPlus solution in Japan during the first quarter of 2005.  Strong sales growth was reported in the rest of Asia, except in China due to the impact of changes made in its distribution networks earlier in 2005."

147.    The statements set forth in Defendants' filings with the SEC during the Class

Period concerning *ReNu*'s safety and growth prospects were materially false, incomplete and

misleading because Defendants did not disclose that the Company had received numerous

reports from Hong Kong and Singapore starting in at least June 2005 that *ReNu* was associated

with increased incidence of Fusarium Keratitis and that it was not a safe product.  As a result,

Defendants failed to disclose a material risk to the Company and to its sales growth forecasts

44

which had no reasonable basis because consumers would refuse to buy *ReNu* products once the truth about *ReNu* was revealed.

148.    On February 21, 2006, the Singapore Ministry of Health identified 39 cases of Fusarium eye infections, of which 34 were *ReNu* users.  The update stated that Bausch & Lomb had "voluntarily suspended sales of its ReNu multipurpose solution."

149.    Also in February 2006, Hong Kong Officials asked Bausch & Lomb officials to pull *ReNu* from the shelves.

150.    Bausch & Lomb eventually responded by suspending sales of *ReNu* in Hong Kong and Singapore in February 2006.  Despite this drastic measure, Bausch & Lomb continued to sell *ReNu* everywhere else.

151.    This was particularly troubling because the same Bausch & Lomb factory in South Carolina produced all the *ReNu* solutions sold in Hong Kong, Singapore, and the United States.  Nevertheless, despite the warnings by the Hong Kong and Singapore health authorities to Bausch & Lomb, and despite the Company's agreement to suspend sales of *ReNu* in Singapore and Hong Kong in February 2006, Defendants continued to market *ReNu* as a safe product in the United States and other markets and to deny that it was a risk factor for Fusarium Keratitis.  For example, a February 22, 2006 article carried by *Reuters* quoted a Bausch & Lomb spokeswoman saying that "[w]e are confident that a thorough and scientific investigation will clear our product of any involvement" in the eye infections reported from Singapore.  Instead of disclosing the truth to the Plan and its participants, Defendants continued their misrepresentations and omissions.

152.    Notwithstanding that **34 out of 39** individuals in Singapore with keratitis used the Company's ReNu lens solution, Bausch & Lomb issued a carefully crafted press release that was

designed to convey that its voluntary suspension of *ReNu* in Singapore and Hong Kong was

precautionary in nature and to deny any nexus between keratitis and its *ReNu* products.  The

press release stated as follows:

> SINGAPORE, Feb. 22, 2006 -- Bausch & Lomb today strongly reaffirms its commitment to closely collaborate with the Singapore and Hong Kong health authorities to speedily complete their thorough scientific investigation into the cause or causes of the unprecedented outbreak of fungal keratitis in Singapore.
>
> The company will spare no effort in supporting health regulatory authorities in both Hong Kong and Singapore to speedily conclude their investigation into these unusual cases of keratitis.
>
> "The health and safety of contact lens wearers are Bausch & Lomb's first priority," said John M. Loughlin, corporate senior vice president and president Asia Region. "As the world leader in lens care technology, and the market leader in Asia, we continue to work closely with the regulatory authorities and eye care professionals throughout the region to address any contact lens related issues and educate consumers about the importance of the proper care of their lens."
>
> In Singapore, where there has been an unusually high number of unprecedented fungal keratitis cases reported, **we support the request of the health ministry to take precautionary measures to safeguard public health. In that regard, at the request of the ministry, Bausch & Lomb has voluntarily suspended sales of *ReNu* lens care products** to facilitate speedy investigation and conclusion of these cases.
>
> In Hong Kong, the Department of Health has been monitoring the situation locally and in Singapore. **It is important to note that the cause of these infections has not been determined.**  As reported by the Singapore Ministry of Health, the causes may be due to several factors. The Singapore health authority has also reported poor compliance with appropriate lens care procedures as a factor in most of the reported cases in Singapore.  **The cause of the outbreak is still to be determined.**
>
> We have pledged our full cooperation and collaboration to the ministries to support their investigations. Bausch & Lomb will spare no effort to assist both health regulatory agencies to conduct their thorough scientific analysis.

Singapore

Bausch & Lomb had earlier voluntarily suspended sales of ReNu
in the Singapore market to support the Ministry's request to adopt
precautionary measures to safeguard public health. In addition, if
consumers wish to consider return of products, Bausch & Lomb is
exploring options on how best to achieve this. Further details will
be advised shortly.

Hong Kong

Bausch & Lomb is voluntarily suspending sales of ReNu in Hong
Kong to facilitate analysis. In addition, if consumers wish to
consider return of products, Bausch & Lomb will explore options
on how best to achieve. Further details will be advised shortly.

Other Markets

**As there has been no unusual incidence of fungal keratitis
reported in other markets, Bausch & Lomb does not believe it
is appropriate to consider actions elsewhere.** But the company
will continue to monitor the situation and stay in close contact with
regulatory officials and communicate the progress of the ongoing
investigations.

(Emphasis added).

153.    As a result of this carefully crafted disclosure, on February 23, 2006, Bausch &

Lomb's stock price declined only 3.5%, to $69.40 per share from a prior close of $71.98 per

share on February 22, 2006.  In truth, however, the causal relationship between the Company's

*ReNu* products and Fusarium keratitis was real.

154.    On February 24, 2006, the *Taipei Times* reported:

Bausch & Lomb says lens solution to stay on shelves.

Eye-care product maker **Bausch & Lomb Inc said it has no plan
to withdraw its *ReNu* contact lens solution from Taiwan,** after a
series of eye infections in other countries in the region were linked
to the product. The company said the product won't be recalled
because no eye infections have been discovered here.

**"We urge local consumers not to panic, as the unusual
incidence of fungal infection has been only reported in
Singapore and Hong Kong besides, there is no concrete**

> **scientific proof showing that the infections were caused by our products," the company said in a statement yesterday**.
>
> Bausch & Lomb suspended sales of its ReNu contact lens solution in Hong Kong, after halting sales in Singapore following a series of eye infections reported last week. A high proportion of the affected people were found to be users of ReNu multipurpose contact lens solution.
>
> Most of Bausch & Lomb's products sold in the Asia-Pacific, including Singapore, Hong Kong and Taiwan, are produced in the US, said Jessica Lu , a sales manager at Bausch & Lomb Taiwan Ltd.
>
> **According to a preliminary investigation by the Singaporean government, most of the infections were associated with poor habits by users, such as wearing contact lenses while sleeping, or continuing to use contact lenses that should have been disposed of after a certain period of time, which raises the risk of keratitis, Lu said.**
>
> Keratitis is a corneal infection or inflammation. Prompt treatment is important, to avoid permanent eye damage. About 700,000 to 800,000 people in Taiwan use Bausch & Lomb's product, **giving the firm about a 60 percent market share, Lu said**.

(Emphasis added).

155.    A few weeks later, on March 8, 2006, the Centers for Disease Control and

Prevention ("CDC") received a report from an ophthalmologist in New Jersey about three

patients with "contact lens-associated Fusarium Keratitis during the preceding 3 months,"

according to a CDC press release on April 10, 2006.  The CDC and FDA began an investigation

into Fusarium Keratitis cases in the United States and requested information from Bausch &

Lomb.

156.    On March 15, 2006, the Malaysia Health Ministry ordered the immediate

withdrawal of all *ReNu* multipurpose contact lens care solutions manufactured by Bausch &

Lomb.  As reported in the March 16, 2006 edition of the *Malaysia General News*, Bausch &

Lomb, in response to the order by the Malaysia Health Ministry, again vehemently defended its

brand and asserted the infections were unrelated to its *ReNu* products:

> NO PROOF SOLUTION CAUSED INFECTION, SAYS
> BAUSCH & LOMB
>
> Bausch & Lomb, manufacturer of the ReNu multipurpose contact
> lens care solution, has expressed its surprise over the Health
> Ministry's request for the product's withdrawal from the market.
>
> Health Minister Datuk Dr Chua Soi Lek yesterday called for
> optical stores to withdraw the ReNu contact lens solution from
> their shelves after being informed by the Tun Hussein Onn eye
> hospital in Petaling Jaya of cases of fungal keratitis infections
> among its patients who used the solution.
>
> In a statement today, **Bausch & Lomb said that it was illogical to
> call for a withdrawal of its solutions as half of the patients
> diagnosed with the fungal eye infections did not use its
> products. "It is evident from this data to date that there must
> be some separate or unrelated contributor or cause of this
> infection," it said**.
>
> Bausch & Lomb also expressed its surprise over the report as it
> said the Health Ministry has invited all contact lens solution
> manufacturers to a meeting today to discuss the issue and the state
> of research conducted to determine the connection between the eye
> infections, contact lens use and any contact lens solution.
>
> The company said it had not been officially advised by the Health
> Ministry on the withdrawal of ReNu solutions, but was seeking
> official clarification from them on the matter. The contact lens and
> lens care manufacturer also said that it produced lens care solutions
> marketed under the Alcon and Complete brands.
>
> The statement also said that Bausch & Lomb had proposed to the
> Health Ministry a two-pronged strategy to determine the cause of
> the infection and the necessary prevention steps, which were by
> public education campaign on proper contact lens care and use;
> and a surveillance programme to better define the extent of the
> issue and possible causes.
>
> **"If we believe there is a problem with our product, we will of
> course take the appropriate and responsible actions," it said.**
>
> Yesterday, the Health Ministry revealed that the Tun Hussein Onn
> Eye Hospital had listed 14 contact lens-related infective keratitis

49

> cases between January 2005 and February 2006. Out of the 14, six
> patients cited ReNu as the solution used, one used a combination
> of ReNu and Alcon solutions while four reported using Complete
> solution. Dr Chua said the withdrawal order only applied to ReNu
> first, based on information received from the eye hospital.

(Emphasis added).

157.     Here again, Bausch & Lomb tried to discredit the association between its flagship

*ReNu* products and keratitis.  In response to the above disclosures, Bausch & Lomb's stock price

declined from $67.01 per share on March 14, 2006, to $65.06 per share on March 16, 2006,

before rebounding to $68.87 on March 17, 2006.

158.     According to a *Reuters* article dated March 31, 2006, authorities in Singapore

linked the higher incidence of Fusarium keratitis to *ReNu*.   As reported in a *Morningstar* article

dated March 31, 2006, Asian officials identified *ReNu* as the cause of the increase in incidence of

Fusarium keratitis and noted that "no other contact-lens solution has been singled out."

159.     On March 31, 2006, after the markets closed, Defendants announced that the

Company had partnered with health authorities and researchers to investigate the extent and

cause of an increase in instances of the "rare fungal infection," Fusarium keratitis, in contact-lens

wearers in Singapore, Hong Kong and Malaysia.  The press release again downplayed the

problems with *ReNu*, stating in relevant part:

> **Bausch & Lomb Collaborates with Experts to Investigate**
> **Extent and Cause of Fungal Eye Infections**
>
> Bausch & Lomb is collaborating in a scientific investigation with
> health authorities and leading experts around the world including
> the U.S. Centers for Disease Control and Prevention, Bascom
> Palmer Eye Institute at the University of Miami, Johns Hopkins
> Wilmer Eye Institute, and the Ministries of Health in Singapore,
> Hong Kongand Malaysia, to determine the extent and cause of an
> increase in a rare fungus infection among contact lens wearers that
> first surfaced in certain parts of Asia.

Based on the Company's data to date and consultations with leading epidemiologists, **Bausch & Lomb believes that the root cause of these infections is not related to a specific contact lens or lens-care product.**

Reports of an unusual incidence of Fusarium keratitis among contact lens wearers first came from health authorities in Singapore, Hong Kong and Malaysia. Because these infections are rare, there now is a heightened level of awareness and surveillance surrounding this issue in other markets, resulting in reports of cases from a variety of locations. Efforts to enhance surveillance programs that track the incidence of the fungal infections are now in place in the U.S., Singapore, Hong Kong and Malaysia.

Specifically,

- Bausch & Lomb initiated contact with the U.S. Centers for Disease Control and Prevention to develop a system to investigate and track the incidence of these infections. Johns Hopkins Wilmer Eye Institute is working with the CDC to implement a surveillance program involving leading corneal treatment centers in the U.S.

- Bausch & Lomb is working with independent experts in microbiology to collect and culture clinical isolates of Fusarium from patient samples to identify the genetic make-up of the organisms, and to determine if they represent an uncommon variant of the fungus.

- Bausch & Lomb is collaborating with health authorities in Singapore and Hong Kong in completing a case control study to assess what common factors existed among the patients with infections.

- Bausch & Lomb has met with leading optometrists and ophthalmologists to raise the level of awareness of the situation and assist in public health-information programs.

Evidence Suggests Proper Lens Care is Paramount

**Many of the reported cases in Asia involved examples of poor patient compliance with lens care regimens and contact lens wear, including wearing expired lenses and re-using daily disposable contact lenses**.

\* \* \*

Extensive Testing Confirms Sterility and Efficacy of ReNu Multi-Purpose Solutions

**When the first reports of the unusual spike in contact lens-related Fusarium keratitis in Singapore and Hong Kong first**

**came to the attention of Bausch & Lomb, the Company immediately suspended sales of ReNu multi-purpose solutions there** and initiated an extensive series of additional tests on the sterility and biocidal efficacy of its products. The results have yielded **no evidence to suggest that the products in any way caused or contributed to the infections.** Moreover, health authorities in Hong Kong and Shanghai reported that their independent tests of samples of ReNu multi-purpose solutions obtained in those markets confirmed that the products are sterile. Examples of the Company's test results are listed below.

- Product from the lots of ReNu(R) with MoistureLoc(R) multi-purpose solution that were identified as being used by patients in Singapore and Hong Kong, were tested and proved to be stable, sterile and highly effective in killing the fungus.

- Product from the lots of ReNu with MoistureLoc and ReNu(R) MultiPlus(R) multipurpose solutions that were shipped to Hong Kong and Singapore were tested and proved to be stable, sterile and highly effective in killing the fungus.

- **Product samples collected from the Hong Kong, Malaysia and Singapore markets were tested** with a full panel of biocidal challenge organisms and full chemical testing was performed. All testing indicated that the samples were within specification and highly effective in killing bacteria and fungi.

- **Bausch & Lomb's FDA-certified manufacturing facility in South Carolina has been extensively tested; all product samples pass rigorous sterility, safety and efficacy tests and environmental monitoring confirms that the facility is in full compliance with Good Manufacturing Practices**.

**ReNu multi-purpose solutions meet the stringent safety, efficacy and quality standards set by the U.S. Food and Drug Administration and similar health agencies around the world**. In fact, Bausch & Lomb has determined that among the major brands of contact lens care products, **ReNu multi-purpose solutions have unsurpassed disinfecting efficacy against Fusarium as well as other known ocular pathogens.**

**Bausch & Lomb indicated that this situation is expected to reduce first quarter vision care revenues in the Asia region by as much as $10 million versus the Company's internal expectations.** Hong Kong and Singapore are relatively small markets, but the publicity associated with the unusual incidence has spread beyond their borders. That has depressed sales in other areas, particularly China, which is being impacted despite the fact

>       that there have been no reports of Fusarium infections among
>       contact lens wearers there.

(Emphasis added).

160.    Bausch & Lomb stock fell to close down $2.45 at $61.25 on the next trading day,

April 3, 2006.

161.    On April 7, 2006, after the markets closed for the weekend, Bausch & Lomb

issued a press release encouraging contact lens wearers to protect the health of their eyes by

following certain guidelines from the American Optometric Association.

162.    In a report by the CDC dated April 10, 2006 and entitled: "Fusarium Keratitis-

Multiple States 2006", the CDC stated that it was reviewing reports of 109 cases of suspected

fungal keratitis of which thirty cases were reviewed as of April 9, 2006 and twenty-eight

involved contact lens-wearers.  Twenty-six reported using a *ReNu* brand or a generic-brand

solution manufactured by the Company and five reported using a combination of *ReNu* and

products manufactured by other companies.

163.    On April 10, 2006, after the markets closed and only after both the FDA and CDC

openly addressed the high incidence of Fusarium keratitis among *ReNu* users in the U.S., Bausch

& Lomb announced that it was temporarily suspending U.S. shipments of *ReNu* in order to

facilitate the further investigation of reports of fungal keratitis among U.S. contact lens wearers.

164.    On April 10, 2006, the CDC issued a press release which stated:

>       As of April 9, 2006, a total of 109 patients with suspected
>       Fusarium keratitis were under investigation in multiple states. Case
>       finding was conducted through postings on the Epidemic
>       Information Exchange (Epi-X) and ophthalmology listservs and
>       through queries of clinical microbiology laboratories. CDC is
>       coordinating an investigation with public health authorities in
>       California, Connecticut, Florida, Georgia, Iowa, Maryland,
>       Massachusetts, Michigan, Missouri, New Jersey, New York, North
>       Dakota, Ohio, Pennsylvania, Tennessee, Texas, and Vermont. The
>       majority of patients have yet to be interviewed; however, of **30**

**patients for whom complete data were available**, the median age was 48 years (range: 13--83 years),and 21 (70%) were female; infection onset occurred during June 15, 2005--March 18, 2006.

**Twenty-eight patients (93%) wore soft contact lenses**, and two (7%) reported no contact lens use.  **Among contact lens users, 26** (93%) remembered which solution they used during the month before infection onset or had retained the actual bottle.  **Of these, 26 (100%) reported using a Bausch & Lomb (Rochester, New York) ReNu brand contact lens solution or a generic-brand solution manufactured by Bausch & Lomb.**  Patients reported using various ReNu product types from multiple product lots. Five (18%) patients reported using other solutions in addition to the ReNu solution, including solutions made by Advanced Medical Optics, Inc. (Santa Ana, California) and Alcon (Fort Worth, Texas). Nine (32%) patients reported wearing contact lenses overnight, a known risk factor for microbial keratitis. Eight **(29%) required corneal transplantation.** Laboratory testing to evaluate product contamination, including typing of Fusarium spp. isolates, is ongoing.

(Emphasis added).

165.    That same day, in response to the above press release, Bausch & Lomb

announced the suspension of U.S. shipments of *ReNu with MoistureLoc* produced at its

Greenville, South Carolina, manufacturing facility, but not before Defendant Zarrella engaged in

some damage control about whether *ReNu* with MoistureLoc promoted keratitis:

> **Bausch & Lomb (NYSE:BOL) announced today that it is temporarily suspending U.S. shipments of ReNu with MoistureLoc produced at its Greenville, S.C.**, manufacturing facility in order to facilitate the further investigation of reports of fungal keratitis infections among contact lens wearers in the United States. This action does not affect any other Bausch & Lomb products. Today's announcement follows the release of a report by the U.S. Centers for Disease Control and Prevention that it is reviewing reports of 109 cases of suspected fungal keratitis. The CDC reports that the majority of cases have yet to be reviewed, but of the 30 cases reviewed to date, 28 involved contact lens wearers. Twenty-one reported using ReNu brand contact lens care products and 5 reported using a combination of ReNu and products manufactured by other companies. Bausch & Lomb has been collaborating with the U.S. Food and Drug Administration, the CDC, major eye centers and health authorities in a

comprehensive investigation to determine if the reports represent an increase in the historical incidence of these infections, and to determine the root cause.

"Bausch & Lomb's first priority is the health and safety of consumers," said Ronald L. Zarrella, chairman and CEO of the company. **"The CDC data released today are both troubling and perplexing, as there is an apparent disproportionate representation of U.S. manufactured ReNu with MoistureLoc in the underlying data.** The source of these infections has not been determined. **Based on our extensive testing, analysis and further internal reviews, and communications with leading experts, the available scientific evidence does not establish any type of ReNu solution as a cause**.

**"The CDC has not determined if these reports represent an increase of Fusarium keratitis infections and is continuing to investigate the association, if any, of these cases with any product. Nonetheless, in the interest of public health, we will voluntarily suspend U.S. shipments of ReNu with MoistureLoc while we pursue all appropriate steps to bring this investigation to a definitive conclusion," Zarrella concluded.**

(Emphasis added).

166.    The following day, Wal-Mart, Rite Aid, Walgreens and Eckerd and Brooks each announced that they were pulling ReNu with MoistureLoc from their shelves.  In fact, Walgreens, the nation's largest drug store, said that it was removing the entire *ReNu with MoistureLoc* product line from its stores.  The following day CVS and Albertson's followed suit and began removing *ReNu with MoistureLoc* from their stores.

167.    On this news, Bausch & Lomb common stock closed down more than $8 a share at $49.03 a share on April 11, 2006, on unusually high volume of more than 26.7 million shares traded.

168.    Michael Weinstein, a JPMorgan analyst in New York, issued a note to his company's clients stating that "**halting lens-care sales in the U.S. represents a worst-case scenario** of sorts, reminiscent of Johnson & Johnson's 1982 Tylenol scare."  Weinstein called

*ReNu with MoistureLoc* **Bausch & Lomb's "flagship product within the Company's most profitable segment"** and stated that **"the spill over effect to the broader ReNu brand could be significant."** [Emphasis added.]

169.     Milton Hsu, an analyst at Bear Stearns, commented that "this is one of their highest margin businesses."  Hsu also said: "We're going to remain on the sidelines here, just because of the uncertainty over whether or not this is really related or directly linked to ReNu. In a worst-case scenario, you could see another $100 million come out of [the Company's revenues], which could mean the stock is a low $40 stock."

170.     Credit Suisse First Boston analyst Ken Kulju cut Bausch & Lomb's forecasted earnings, stating that "while the sales suspension was characterized as temporary, the loss of ReNu with MoistureLoc domestic sales volumes will have a significant impact on Bausch's 2006 earnings."

171.     The following day, April 12, 2006, Bloomberg reported:

> **Shares of Bausch & Lomb Inc. on Tuesday plunged nearly 15% on news that the contact lens maker had stopped shipping a cleansing solution linked to a rare fungal infection that can cause blindness.**
>
> Bausch & Lomb suspended deliveries of ReNu with MoistureLoc, **its fastest growing product for cleaning contact lenses,** after the U.S. Centers for Disease Control and Prevention said it was reviewing 109 cases of suspected fungal keratitis. Wal-Mart Stores Inc., Walgreen Co. and Rite Aid Corp. have stopped selling the product.
>
> Of 30 cases reviewed, 26 involved wearers of soft contact lenses who were using Bausch & Lomb's ReNu products, the Rochester, N.Y.-based company said. **ReNu with MoistureLoc accounted for $45 million in 2005 sales,** and other products in the ReNu line may also be tarnished, said Michael Weinstein, a J.P. Morgan analyst in New York, in a note to clients.
>
> "Halting lens-care sales in the U.S. represents a worst-case scenario of sorts, reminiscent of Johnson & Johnson's 1982

Tylenol scare," Weinstein said. **He called the solution Bausch & Lomb's "flagship product within the company's most profitable segment."**

Johnson & Johnson recalled 31 million bottles of Extra-Strength Tylenol in 1982 after seven people died from poisoning by cyanide introduced into pill bottles on store shelves. The company subsequently packaged the pills in tamper-resistant containers. The incident became the textbook case for product-crisis management after the medicine quickly recouped lost sales, partly because of the safety steps.

Alcon Inc., the largest eye-care company with 2005 sales of $4.4 billion, said it and Bausch & Lomb each accounted for about 26% of the U.S. market for contact lens solution.

Bausch & Lomb, a 153-year-old maker of optical products, gets 23% of its sales from lens-care products and 30% from contact lenses, according to its 2004 annual report. The company had 2004 sales of $2.2 billion.

**Its shares fell $8.41 to $49.03. The decline was its biggest since a 36% plunge Aug. 24, 2000**, when the company reduced its earnings forecast and fired its chief executive. Analysts at First Albany Cos., Robert W. Baird & Co., Piper Jaffray & Co. and JP Morgan Chase & Co. issued downgrades.

(Emphasis added).

172.     Recognizing the risk of irreparable damage to the Company's flagship ReNu

brand, Defendant Zarrella held a conference call with securities analysts on April 12, 2006,

where he continue to defend *ReNu with MoistureLoc*, stating:

*ReNu with MoistureLoc* is as safe as effective as anything on the market;

There's no indication there is a formula problem here;

We have been working with the FDA, the CDC, major eye centers and health authorities for a couple of months now to address an apparent increase in reports of fungal keratitis among contact lens wearers. I say apparent since the normal incident rate of these infections isn't really well understood because they haven't been tracked;

But we are at a point now where we will start aggressively supporting our brands on the basis of what we know now, and convince consumers that the products we have our safe and effective;

Both the CDC and the FDA have indicated that no cause and effect relationship has been established between the infections and any product, including ours. And, in fact, they have not even determined if this number of cases actually represents an increase in Fusarium infections above the normal rate; and

Remember, this only affects *ReNu with MoistureLoc* in the United States. The product in Europe is supplied out of a plant in Europe, and there's been no incidents of Fusarium infections, no reported incidents of Fusarium infections in Europe. The business in China is supplied from a plant in China, and there's been no reported incidents in China.

173.    Accordingly, that same day *Bloomberg* reported:

Firm will not recall lens cleaner. Retailers have been pulling the Bausch & Lomb product from their shelves. The contact-lens solution is linked to an eye fungus.

Bausch & Lomb Inc. said yesterday that **it did not plan to recall a contact-lens cleaner linked to eye infections, and defended the product's safety**, as retailers across the United States pulled the solution from their shelves.

Chief executive officer Ron Zarrella said that *ReNu with MoistureLoc* kills the fungus that causes the infection and that **he might initiate a marketing campaign to rebuild the product**. Drugstores and supermarkets are pulling the cleanser off their shelves. Bausch & Lomb shares fell for a 15th straight day.

Zarrella, 56, said there might be "ripple effects" on the sales of other Bausch & Lomb lens cleaners, the contact lens maker's **most profitable business,** as consumers steered clear of the entire *ReNu* line. Analysts said the company, based in Rochester, N.Y., had limited time to develop a strategy for allaying patient fears related to an infection that can cause blindness.

(Emphasis added).

174.     Contrary to Defendant Zarrella's representations above, that very same day, April

12, 2006, the Singapore Ministry of Health issued a press release discussing a study finding a

"strong association" between the use of *ReNu* solution and the onset of corneal infection:

> There has been an additional 36 cases of fungal corneal infection
> reported since the last update in late February (39 cases).  **In total,
> 75 cases of fungal corneal infection (which tested positive for
> Fusarium) with a history of contact lens use have been
> reported for the period 1 Nov 2004 to 12 April 2006.  This
> compares with two reported cases from 1 Jan to 31 Oct 2004**.
>
> **In view of the potentially serious adverse visual consequences
> of fungal corneal infection, the Ministry of Health had on 17
> Feb 2006 advised all contact lens users as a precautionary
> measure to discontinue the use of Bausch and Lomb's ReNu
> multipurpose contact lens solution for the time being**.
>
> * * *
>
> A comprehensive case-control study (comparing contact lens users
> with infection and contact lens users without corneal infection)
> was undertaken in Feb-Mar 2006 to investigate risk factors for the
> spike in fungal corneal infection.  **The study found a strong
> association between corneal infection and the use of ReNu
> solution.**  This association remained strong even after taking into
> consideration socio-demographic, lens, hygiene and environmental
> factors.  The findings are also consistent with recent observations
> made in the US and Hong Kong.

(Emphasis added).

175.     The Singapore Ministry of Health also noted that the number of cases of

Fusarium keratitis in Singapore had risen to 75 and that 56 of these injured people used *ReNu*.

While Defendants already knew through Asian officials' concerns that there was an increased

incidence of eye infections linked to *ReNu*, and that the Company had weeks before suspended

sales of *ReNu* products in Asia, the Company failed to suspend sales in the U.S. or fully disclose

the extent of the problems.

176.    As major retail chains removed the product from their shelves, some took the added measure of removing all products under the *ReNu* brand other than *ReNu with MoistureLoc*.

177.    During the Class Period, Defendants should have known that the significant prevalence of fungal infections among *ReNu* users would subject the Company to increased scrutiny both by the FDA and CDC and that such scrutiny could lead to *ReNu* recalls negatively impacting the Company's revenue stream.

178.    On April 12, 2006, Defendant Zarrella stated that the previously delayed Form 10-K would be further delayed, failing to elaborate on the reasons behind the additional delay.

179.    On April 12, 2006, *The Wall Street Journal* reported that analysts project that the Company may lose $75 million to $100 million in lens solution sales in 2006 because of the *ReNu* debacle which amounts to approximately one quarter of the Company's total revenue.

180.    On April 12, 2006, the price of Bausch & Lomb stock dropped another $3.42 per share, or 7%, closing at $45.61 per share in NYSE composite trading. In response to the continuing problems with *ReNu with MoistureLoc*, during the fifteen days ended April 12, 2006, Bausch & Lomb's stock dropped 32%, losing $1.18 billion of market value and taking with it the value of the vested retirement benefits in the Plan.

181.    Defendants' statements detailed above were materially false and misleading when made because in addition to containing false financial results, defendants' statements misrepresented the risk of investing Plan assets in the Fund because they concealed that (a) one of the Company's leading products, *ReNu*, was associated with an increased risk of eye infections, specifically Fusarium Keratitis; (b) quality control issues, including at the Company's Greenville, South Carolina plant, where *ReNu* is manufactured, existed and were not properly

addressed; and (c) the disproportionate number of Fusarium Keratitis cases involving *ReNu* users jeopardized the Company's ability to continue selling the product.

182.    On or about April 13, 2006, Bausch & Lomb finally pulled *ReNu* from further distribution and sale to the public in the United States.  Bausch & Lomb asked retailers in the U.S. to remove *ReNu with MoistureLoc* from their shelves and offered refunds to consumers. Bausch & Lomb further recommended that consumers use another lens care solution until the investigation was completed into domestic reports of the fungal keratitis infections among contact lens wearers.

183.    On April 14, 2006, *The Wall Street Journal* reported that  Bausch & Lomb asked retailers to stop selling *ReNu* after many stores had already pulled the product from its shelves. In the Company's "voluntary market withdrawal," Bausch & Lomb stated that contact lens wearers should shift to another brand until the Company and federal authorities complete their investigation of  links between the eye infection outbreak and *ReNu*.  The Company did not actually recall the product, but instead instructed retailers to hold onto *ReNu* products pending the outcome of the investigation.

184.    On April 27, 2006, *Reuters* reported that Hong Kong authorities alerted Bausch & Lomb as early as September 2005 to a rise in eye infections among contact-lens wearers in Hong Kong and that the Company waited five months before it suspended *ReNu* sales in Hong Kong and Singapore in February 2006.

185.    On April 27, 2006, in a statement to *The Wall Street Journal*, the Company first publicly acknowledged that the Hong Kong health authorities notified the Company of Fusarium keratitis infections in users of *ReNu* solutions in November 2005, three months before the

Company stopped selling *ReNu* in Hong Kong and five months before the Company publicly

disclosed the association between *ReNu* and eye infections in the United States:

> Bausch & Lomb Inc. said Hong Kong health authorities notified it of eye infections in users of the company's contact-lens solution ***in November 2005***, several months before the company stopped selling the product there.
>
> The November time frame is the earliest the company has acknowledged being aware of an infection, Fusarium keratitis, among users of its contact-lens solution. Outbreaks of the infection have led to a sales halt of one of its products, ReNu with MoistureLoc, in at least three countries, including the U.S.
>
> \*   \*   \*
>
> In an email, [B&L spokeswoman] Ms. Graham said Hong Kong authorities reported to the company **in November 2005** that they had "noted an increase in hospital admissions due to contact-lens-related keratitis from June to September 2005." Hong Kong officials reported to the company they interviewed 62 patients, of which 25 said they had used a ReNu solution. No information was provided to Bausch regarding the remaining 37 patients, Ms. Graham said. Of the 25 patients who used ReNu, there were seven cases of Fusarium keratitis, she said. The company performed an investigation which involved "a review of manufacturing records, testing data and release criteria" and provided a report of its investigation to Hong Kong officials, Ms. Graham said. "No additional questions or clarifying requests were made by the Hong Kong authorities" at the time, she added.

(Emphasis added).

186.   That same day, *Bloomberg* reported:

> David Morris, an analyst at Banc of America Securities in New York, as saying "Physicians have told us the reported numbers of cases is just the tip of the iceberg," and "We don't know why Bausch & Lomb has decided to keep ReNu on the market";
>
> Art Epstein, a Long Island, New York optometrist who chairs the American Optometric Association's contact lens and cornea section, as saying he "believes the infections are only linked to the MoistureLoc brand" and that the "numbers [of keratitis infections] are grossly underestimated."

187.    Defendants first disclosed on May 3, 2006 that cases of Fusarium Keratitis among

*ReNu* solution users had been reported in Europe.  This is significant because the *ReNu* products

sold in Europe were manufactured at a Company factory in Milan, Italy, whereas the *ReNu*

products sold in Asia and the United States were produced at a Company factory in Greenville,

South Carolina.  Thus, the cases in Europe further support the likelihood that *ReNu* products

have a causal link to Fusarium Keratitis.  The press release stated in part:

> Bausch & Lomb made the following statement in response to preliminary data released late yesterday by the U.S. Centers for Disease Control and Prevention as part of its investigation of Fusarium keratitis cases.
>
> **These preliminary data require further examination** and should be placed in proper context. Bausch & Lomb continues to fully cooperate with the U.S. Food and Drug Administration and the CDC in a comprehensive investigation to determine the root cause of the unusual incidence of fungal keratitis. Bausch & Lomb will review this information later today with the CDC in a previously scheduled meeting.
>
> Studies suggest that Fusarium keratitis occurs among contact lens wearers at a low rate. It would be expected that the distribution of lens care products associated with these cases would be roughly proportional to the products' relative market share. In the small sample of cases CDC has analyzed to date, the 27-percent representation of *ReNu MultiPlus* solution is well below its approximate 40-percent market share. MultiPlus solution is used by nearly 11 million contact lens wearers in the U.S. in either its branded or private label form. More than 30 million consumers worldwide have used MultiPlus, which has maintained an excellent record of safety and effectiveness since it was introduced in 1997.
>
> **The 57-percent share of cases preliminarily reported for the company's MoistureLoc formula is significantly and disproportionately higher than its U.S. market share of less than 10 percent**, which represents approximately 2.3 million users. This disproportionate representation of the *MoistureLoc* formula in the CDC case reports is the reason Bausch & Lomb voluntarily withdrew *MoistureLoc* from the market while the investigation to determine the cause of these unusual infections continues.

(Emphasis added).

188.    On this news, Bausch & Lomb shares closed at $43.97, down $4.78 a share, on May 3, 2006.

189.    The revelation of the link between *ReNu* and Fusarium Keratitis has devastated the Company's sales, demonstrating that Defendants' prior optimistic forecasts had no reasonable basis when made because of the high incidence of eye infections among *ReNu* users.

190.    According to a May 4, 2006 article on *NewsInferno.com*, "[p]resently, the CDC has received 191 reports of eye infections caused by the [F]usarium [k]eratitis fungus, with 86 of those cases being confirmed.  Some 54 of the 58 contact lens wearers stated that they had used a Bausch & Lomb lens cleaning solution."

191.    According to data assembled by *ACNielsen* market researchers and published by Bank of America Securities on May 5, 2006, the Company's lens-care business had a 42% market share in the week ended April 8, 2006, two days before the Company stopped shipping *ReNu with MoistureLoc*.  In the weeks ended April 15 and 22, 2006, the Company's lens-care market share fell to 29%.

192.    On May 15, 2006, Bausch & Lomb finally announced a worldwide recall and permanent removal of *ReNu* from the market.

193.    On May 16, 2006, the FDA reported that the Company failed to promptly notify it within 30 days of the approximately 35 cases of fungal-keratitis infections among contact-lens wearers in Singapore.  This failure constituted one of among 20 potential violations noted by the FDA after inspecting Defendants' Greenville, SC factory, where Defendants made *ReNu* for U.S. and Asian market distribution.

194.    In a warning letter dated October 31, 2006 from the FDA to Defendant Zarrella, as Chairman and Chief Executive Officer of Bausch & Lomb, the FDA found that the

Company's contact lens solutions "are adulterated" and that the Company's methods, facilities or controls were "not in conformity with Current Good Manufacturing Practice requirements."  The FDA acknowledged that Bausch & Lomb "recalled all MoistureLoc contact lens solution worldwide to eliminate the serious risk to health associated with an outbreak of Fusarium keratitis" and the FDA detailed many of the violations by the Company including problems with the validation testing that the Company performed in 2003 for *ReNu* solutions which led to the formation of white particles on lenses.  It also found that Bausch & Lomb had not properly performed "USP sterility testing" or other testing for the scaled-up batches of *ReNu*.  The FDA also found that the Company had failed to properly review, evaluate and investigate complaints of Fusarium keratitis, including reports received from Hong Kong, and did not properly test samples associated with complaints received from Malaysia and Singapore.  In addition, the FDA found that the Company's contact lens solutions were "misbranded" and that the Company failed to provide required information about the products, including timely information suggesting that the solutions "may have caused or contributed to a death or serious injury".

195.    In addition, the FDA's Warning Letter stated "[a]lthough the March – May 2006 inspection focused primarily on the MoistureLoc contact lens solution, **the inspection, nonetheless, identified and documented significant** [quality system] regulation **violations that were systemic and are relevant to all products manufactured at the Greenville, SC facility**." [Emphasis added.]

196.    According to a November 7, 2006 article in *The Los Angeles Times*, "Bausch & Lomb Inc. failed to formally report nearly three dozen foreign cases of fungal eye infections later linked to one of its contact lens solutions, according to a federal warning letter."  "The company

later acknowledged that the brand of solution was the potential 'root cause' of increased risk of the fungal infection, called Fusarium keratitis."

197.     Further, according to a December 15, 2006 article in *The Journal Gazette*: "Questions abound over whether Bausch & Lomb reacted quickly enough.  The company stopped selling MoistureLoc in Hong Kong and Singapore in February but only halted U.S. shipments in April."

### Defendants Knew or Should Have Known That Material Information Regarding The Company's Financial Condition And Risks Associated With *ReNu* Was Not Disclosed

198.     Upon information and belief, during the Class Period, each of the Defendants, in the performance of their Company and fiduciary duties, knew or should have known that Bausch & Lomb had failed to disclose material adverse information concerning the financial condition of the Company, and the financial and health risks associated with *ReNu* and that as a consequence of such failure the price of Fund shares was artificially inflated, and ultimately, that the Fund was an imprudent investment for the Plan.

199.     Upon information and belief, Bausch & Lomb and its senior officers knew or should have known of management and accounting improprieties at the Company, including improprieties at the Company's Brazilian subsidiary, BLIO, by at least the beginning of the Class Period.

### DEFENDANTS FAILED TO DISCLOSE THE IMPRUDENCE OF INVESTING IN THE FUND

### Defendants Were Required to Furnish Participants with Complete and Accurate Information

200.     The fiduciaries of the Plan were required under ERISA to furnish certain information to participants.  For example, ERISA § 101, 29 U.S.C. § 1021, requires that fiduciaries furnish a SPD to participants.  ERISA § 102, 29 U.S.C. § 1022, provides that the SPD

must apprise participants of their rights under the Plan.  The SPD and all information contained

or incorporated therein constitutes a representation in a fiduciary capacity upon which

participants were entitled to rely in determining the identity and responsibilities of fiduciaries

under the Plan and in making decisions concerning their benefits and investment and

management of assets allocated to their accounts:

> The format of the summary plan description must not have the
> effect of misleading, misinforming or failing to inform participants
> and beneficiaries. Any description of exceptions, limitations,
> reductions, and other restrictions of plan benefits shall not be
> minimized, rendered obscure or otherwise made to appear
> unimportant. Such exceptions, limitations, reductions, or
> restrictions of plan benefits shall be described or summarized in a
> manner not less prominent than the style, captions, printing type,
> and prominence used to describe or summarize plan benefits. The
> advantages and disadvantages of the plan shall be presented
> without either exaggerating the benefits or minimizing the
> limitations. The description or summary of restrictive plan
> provisions need not be disclosed in the summary plan description
> in close conjunction with the description or summary of benefits,
> provided that adjacent to the benefit description the page on which
> the restrictions are described is noted.

29 C.F.R. § 2520.102-2(b).

201.    Upon information and belief, Defendants regularly communicated with

employees, including Plan participants, about Bausch & Lomb's performance, future financial

and business prospects, and Bausch & Lomb stock, the largest single asset in the Plan.  These

communications were directed specifically at employees/Plan participants at all-employee

meetings, on the Company's website, and in Plan documents and materials which were

disseminated to all participants and beneficiaries, and which expressly incorporated by reference

the Company's misrepresentations and nondisclosures regarding its financial statements and the

financial and health risks associated with *ReNu*.  These communications were acts of Plan

administration, and the persons responsible for the communications were ERISA fiduciaries in this regard.

202.    Upon information and belief, Defendants communicated material information necessary for participants to make informed decisions with respect to the investment of Plan assets in the Fund and in an attempt to comply with ERISA Section 404(c) by referencing and incorporating Bausch & Lomb's SEC filings into documents intended to convey plan related information to participants.  Upon information and belief, Bausch & Lomb's SEC filings were incorporated into Form S-8 registration statements, SPDs, prospectuses and/or other fiduciary communications.

203.    These SEC filings incorporated into Plan documents were representations made to participants in a fiduciary capacity.  Moreover, Defendants exercised discretion in determining or participating in decisions regarding the substantive content of the SEC filings which were incorporated into the SPDs, Prospectuses or S-8 Forms.

204.    The SEC filings which were incorporated by reference into these Plan communications negligently failed to disclose and/or negligently misrepresented the financial condition and the safety profile and financial risks associated with *ReNu*.  Negligent misrepresentations and omissions were contained in at least the following SEC filings:

(a)    Forms 10-K filed with the SEC on March 28, 2001, March 22, 2002, March 21, 2003, August 3, 2004, March 9, 2005;

(b)    Forms 10-Q filed with the SEC on May 4, 2000,  August 7, 2000, November 7, 2000, May 14, 2001, August 10, 2001; November 2001, May 9, 2002; August 13, 2002, November 1, 2002, May 9, 2003, August 7, 2003, November 6, 2003, May 4, 2004, August 3, 2004, November 11, 2004; April 28, 2005, July 28, 2005;  and

(c)     Forms 8-K filed with the SEC on August 25, 2000, August 13, 2002, April 24, 2003, July 24, 2003, October 3, 2003, January 29, 2004, April 21, 2004, July 29, 2004, October 20, 2004, January 27, 2005, April 19, 2005, July 27, 2005.

205.    The statements in these SEC filings were false and misleading because they failed to disclose the true financial condition of the Company and all of the risks associated with *ReNu* as alleged above.

### Defendants Suffered From Conflicts of Interest

206.    Bausch & Lomb's SEC filings, including Proxy Statements, during the Class Period make clear that a significant percentage of corporate Director and Executive Officer compensation is in the form of stock grants or stock option grants.

207.    Because their compensation was so closely tied to the price of Bausch & Lomb stock, Defendants had a very strong incentive to keep the Plan's assets in the Bausch & Lomb Stock Fund (the "Fund"), and to *continually* invest Plan assets each month, in the Fund. Elimination of the Fund as a Plan investment option, on the other hand, would have reduced the demand for Bausch & Lomb Stock in the market and sent a negative signal to Wall Street analysts, both of which would have adversely affected the price of Bausch & Lomb Stock, resulting in lower compensation for the Defendants.

208.    Defendants may have had no choice in tying their compensation to Bausch & Lomb Stock (because compensation was determined by Bausch & Lomb), but they did have the choice whether to keep the Plan participants' and beneficiaries' retirement savings tied to Bausch & Lomb Stock.

209.    Moreover, as demonstrated in the charts below, upon information and belief, Defendants Carpenter, McCluski, Stiles, Nachbar, Panzarella, Kushner and Zarrella, among other

Company insiders, abused their official positions within the Company throughout the Class

Period, prior to Defendants' disclosures that the Company failed to maintain proper internal

controls over financial disclosures and reporting, which subsequently required the Company to

restate its financial reporting and disclosures regarding the health and financial risks associated

with *ReNu*.

210.   Early in the Class Period, Defendants reaped well over $1 million exercising

options:

| INSIDER | DATE | EXERCISED |
|---|---|---|
| Carpenter, William M. | 2000-10-16 | $915,750; 25,000 shares $36.63/share |
| Mccluski, Stephen C. | 2000-10-16 | $347,985; 9,500 shares @ $36.63/share |
| Stiles, Robert B. | 2000-10-16 | $274,725; 7,500 shares @ $36.63/share |
| Kushner, Jurij Z. | 2000-10-16 | $73,260; 2,000 shares @ $36.63/share |

211.   Defendants also reaped substantial profits by selling their own Bausch & Lomb

stock at the same time that they were causing the Plan to acquire and hold the stock:

| Transaction & Date | Insider Relationship | Shares Traded | Average Price | Total Amount |
|---|---|---|---|---|
| 2005-08-10 Sale | MCCLUSKI STEPHEN C (SVP and CFO) | 25,200 | $80.63 | $2,031,824 |
| 2005-02-15 Sale | MCCLUSKI STEPHEN C (SVP and CFO) | 5,239 | $72.9 | $381,923 |
| 2004-11-10 Sale | MCCLUSKI STEPHEN C (Senior Vice President and CFO) | 22,200 | $61.5 | $1,365,300 |
| 2004-11-03 Sale | MCCLUSKI STEPHEN C (SVP and CFO) | 5,000 | $60.9 | $304,500 |
| 2004-08-03 Sale | MCCLUSKI STEPHEN C (SVP and CFO) | 4,500 | $61.5 | $276,750 |
| 2004-03-08 Sale | MCCLUSKI STEPHEN C (SVP and CFO) | 5,280 | $60.64 | $320,179 |
| 2003-12-08 | MCCLUSKI | 4,068 | $51.78 | $210,641 |

| Transaction & Date | Insider Relationship | Shares Traded | Average Price | Total Amount |
|---|---|---|---|---|
| Sale | STEPHEN C (SVP and CFO) | | | |

| Transaction & Date | Insider Relationship | Shares Traded | Average Price | Total Amount |
|---|---|---|---|---|
| 2005-02-01 Sale | STILES ROBERT B (SVP & General Counsel) | 2,280 | $72.95 | $166,326 |
| 2004-12-16 Sale | STILES ROBERT B (SVP & General Counsel) | 1,980 | $65 | $128,700 |
| 2004-11-05 Sale | STILES ROBERT B (SVP & General Counsel) | 1,191 | $62 | $73,842 |
| 2004-08-09 Sale | STILES ROBERT B (SVP & General Counsel) | 1,720 | $61.2 | $105,264 |
| 2004-06-03 Sale | STILES ROBERT B (SVP & General Counsel) | 3,500 | $65 | $227,500 |
| 2004-05-10 Sale | STILES ROBERT B (SVP & General Counsel) | 5,980 | $61.5 | $367,770 |
| 2004-02-19 Sale | STILES ROBERT B (SVP & General Counsel) | 2,736 | $59.05 | $161,561 |

| Transaction & Date | Insider Relationship | Shares Traded | Average Price | Total Amount |
|---|---|---|---|---|
| 2005-08-25 Sale | NACHBAR DAVID R (Senior Vice President) | 31,334 | $77.85 | $2,439,349 |

| Transaction & Date | Insider Relationship | Shares Traded | Average Price | Total Amount |
|---|---|---|---|---|
| 2005-03-07 Sale | PANZARELLA ANGELA J (Vice President) | 1,710 | $72.15 | $123,380 |
| 2004-06-14 Sale | PANZARELLA ANGELA J (Vice President) | 480 | $62.77 | $30,130 |

| Transaction & Date | Insider Relationship | Shares Traded | Average Price | Total Amount |
|---|---|---|---|---|
| 2004-02-20 Sale | KUSHNER JURIJ Z (Vice President & Controller) | 7,800 | $58.28 | $454,584 |

| Transaction & Date | Insider Relationship | Shares Traded | Average Price | Total Amount |
|---|---|---|---|---|
| 2005-08-17 Sale | ZARRELLA RONALD L (Chairman & CEO) | 8,300 | $80.08 | $664,691 |
| 2005-08-17 Sale | ZARRELLA RONALD L (Chairman & CEO) | 4,600 | $80.17 | $368,767 |
| 2005-08-17 Sale | ZARRELLA RONALD L (Chairman & CEO) | 12,100 | $80.63 | $975,608 |
| 2005-05-17 Sale | ZARRELLA RONALD L (Chairman & CEO) | 25,000 | $76.44 | $1,910,948 |
| 2005-02-17 Sale | ZARRELLA RONALD L (Chairman & CEO) | 12,600 | $71.82 | $904,988 |
| 2005-02-17 Sale | ZARRELLA RONALD L (Chairman & CEO) | 12,400 | $71.22 | $883,175 |
| 2004-11-15 Sale | ZARRELLA RONALD L (Chairman & CEO) | 45,000 | $60.93 | $2,741,734 |
| 2004-08-19 Sale | ZARRELLA RONALD L (Chairman & CEO) | 45,000 | $63.58 | $2,860,886 |
| 2004-05-17 Sale | ZARRELLA RONALD L (Chairman & CEO) | 20,100 | $60.47 | $1,215,534 |
| 2004-05-17 Sale | ZARRELLA RONALD L (Chairman & CEO) | 24,900 | $60.94 | $1,517,315 |
| 2004-02-19 Sale | ZARRELLA RONALD L (Chairman & CEO) | 16,900 | $59.1 | $998,759 |
| 2004-02-19 Sale | ZARRELLA RONALD L (Chairman & CEO) | 28,100 | $58.61 | $1,646,913 |

212.    Despite the Company's positive comments during this time period, as alleged above, as seen in the charts above, Defendants engaged in a massive sell-off of Company shares, disposing of thousands of shares for proceeds of tens of millions of dollars.

213.    These conflicts of interest put the Defendants in the position of having to choose between their own interests as executives and stockholders, and the interests of the Plan

participants and beneficiaries, in whose interests the Defendants were obligated to loyally serve with an "eye single."

## CAUSES OF ACTION

### COUNT I

### Failure to Prudently and Loyally Manage the Plan and Plan Assets And Share Material Information with Fellow Fiduciaries

214.     Plaintiffs incorporate by reference the paragraphs above.

215.     This Count alleges fiduciary breach against the following Defendants:  Bausch & Lomb, the Director Defendants, the Administrative Committee Defendants, the Investment Committee Defendants.  As alleged above, during the Class Period, Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

216.     As alleged above, the scope of the fiduciary duties and responsibilities of the Bausch & Lomb, the Director Defendants, the Administrative Committee Defendants and the Investment Committee Defendants included managing the Plan's assets for the sole and exclusive benefit of the Plan's participants and beneficiaries, and with the care, skill, diligence, and prudence required by ERISA.  The Investment Committee was directly responsible for, among other things, selecting prudent investment options, eliminating imprudent options, determining how to invest the assets of the Fund and directing the trustee regarding the same, evaluating the merits of the Plan's investments on an ongoing basis, and taking all necessary steps to ensure that the Plan's and the Fund's assets were invested prudently.

217.     Bausch & Lomb, the Director Defendants, and the Administrative Committee Defendants had control over the actions of the Investment Committee Defendants, who were

employees and agents of Bausch & Lomb and who acted on behalf of Bausch & Lomb.  As set forth previously, Bausch & Lomb actually exercised control over these other Defendants in the performance of their fiduciary obligations.

218.   According to DOL regulations and ERISA case law, a fiduciary's investment or investment course of action is prudent if:  (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the Plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

219.   Again, according to DOL regulations, "appropriate consideration" in this context includes, but is not necessarily limited to:

> A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the Plans portfolio with respect to which the fiduciary has investment duties), to further the purposes of the Plans, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and
>
> Consideration of the following factors as they relate to such portion of the portfolio:
>
> The composition of the portfolio with regard to diversification;
>
> The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the Plans; and
>
> The projected return of the portfolio relative to the funding objectives of the Plans.

220.   Yet, contrary to their duties and obligations under the Plan documents and ERISA, Defendants failed to manage the assets of the Plan loyally and prudently.  Specifically,

during the Class Period, Defendants knew or should have known that the Fund and Bausch & Lomb stock were not suitable and appropriate investments because the prices of Fund shares and Bausch & Lomb stock were artificially inflated as a result of undisclosed material adverse information regarding Bausch & Lomb's financial statements and the health risks of *ReNu*. Nonetheless, during the Class Period, Defendants continued: (a) to offer the Fund shares as an investment option for participant contributions; (b) to match employer contributions in the Fund; (c) to require and/permit the Plan to invest in the Fund; (d) to restrict the Plan's ability to sell shares of the Fund, and; (e) to invest Fund assets in Bausch & Lomb stock.  They did so despite evidence that the Company was misrepresenting and failing to disclose serious material adverse information regarding the Company's earnings and financial condition and risks associated with *ReNu* that artificially inflated the value of the stock and the Fund, and exposed the Plan's investment in the Fund and the Fund's investment in Bausch & Lomb stock to huge risk and certain losses once the truth was revealed, all in violation of their duty of prudence as set forth in ERISA section 404(a)(1)(A) and (B).

221.    Defendants were obliged to manage all of the Plan's assets prudently and loyally. Accordingly, Defendants were obliged to have in place a regular, systematic procedure for evaluating the prudence of company stock.

222.    Defendants had no such procedure.  Moreover, they failed to conduct an appropriate investigation of the merits of continued investment in the Fund and Bausch & Lomb stock, even in light of the Company's highly risky and inappropriate practices, and the particular dangers that these practices posed to the Plan.  Such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of continuing to make and maintain such investments.

223.    In connection with the duty to conduct such an investigation, and even if no investigation were conducted, the members of Defendants who had actual knowledge of the health and financial risks of *ReNu* , and the misrepresentations in the financial statement had a duty of prudence and loyalty, pursuant to section 404(a)(1)(A) and (B) of ERISA, to disclose their knowledge of facts material to the prudence of the Plan's investment in Bausch & Lomb stock to their fellow fiduciaries (including fellow Investment Committee members), so they could protect the Plan from continuing to invest in inflated Bausch & Lomb stock, and failed to do so.

224.    Likewise, any fiduciary of the Plan whose authority or *de facto* exercise of fiduciary responsibility made him a fiduciary with responsibility for the Plan's investments, disclosure to participants of information about those investments, or the appointment and monitoring of fiduciaries who had such responsibilities, had a duty, pursuant to 404(a)(1)(A) and (B) of ERISA, to disclose their knowledge to their fellow fiduciaries who were in a position to protect the Plan from further investment in Bausch & Lomb stock.

225.    The fiduciary duty of loyalty entails, among other things, a duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a Plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the Plan sponsor.  On information and belief, the compensation and tenure of Defendants was tied to the performance of Bausch & Lomb stock and/or the publicly reported financial performance of Bausch & Lomb.  Fiduciaries laboring under such conflicts, must, in order to comply with the duty of loyalty, make special efforts to assure that their decision-making process is untainted by the conflict and conducted in a

disinterested fashion, typically by seeking independent financial and legal advice obtained only on behalf of the Plan.

226.   Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: (a) failing to engage independent advisors who could make independent judgments concerning the Plan's investment in the Fund; (b) failing to notify appropriate federal agencies, including the DOL, of the facts and circumstances that made the Fund an unsuitable investment for the Plan; (c) failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; (d) with respect to each of these above failures, doing so in order to avoid adversely impacting their own compensation or drawing attention to Bausch & Lomb's inappropriate practices, and; (e) by otherwise placing their own and Bausch & Lomb's improper interests above the interests of the participants with respect to the Plan's investment in the Fund.

227.   Moreover, a fiduciary's duties of loyalty and prudence require it to disregard Plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm Plan participants or beneficiaries.  ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow Plan documents or directives that would lead to an imprudent result or that would harm Plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the Plan, to do so.

228.   Defendants breached this duty by:  (a) continuing to offer the Fund as an investment option for the Plan for participant contributions, and requiring certain participants matching contributions to be invested in the Fund; (b) continuing to invest employer matching contributions in the Fund; (c) permitting the Plan to invest both employee and employer contributions in the Fund; and; (d) investing Fund assets in Bausch & Lomb common stock and

for each of these actions doing so when Defendants knew or should have known that Bausch & Lomb stock no longer was a prudent investment for participants' retirement savings.

229.     As a consequence of Defendants' breaches of fiduciary duty alleged in this Count, the Plan suffered tremendous losses.  If Defendants had discharged their fiduciary duties to invest the Plan's assets prudently, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiffs and the other Class members, lost millions of dollars of retirement savings and vested retirement benefits.

230.     Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT II

### Failure to Provide Complete and
### <u>Accurate Information to Participants and Beneficiaries</u>

231.     Plaintiffs incorporate by reference the allegations above.

232.     This Count alleges fiduciary breach against Bausch & Lomb, the Director Defendants, the Administrative Committee Defendants, and the Investment Committee Defendants .

233.     As alleged above, during the Class Period,  Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

234.     As alleged above, the scope of the Defendants' duties included disseminating Plan documents and/or Plan-related information to participants regarding the Plan and/or assets of the Plan, including information as to whether the Plan's investments in the Fund were made prudently and at an appropriate price reflecting available information about the risk and value of such investment.  One way to fulfill these duties was to make appropriate disclosures to each other and to the Plan's participants.

235.     The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the Plan or the Plan's assets, and to disclose information that participants need in order to exercise their rights and interests under the Plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding the Plan's investment options, such that participants can make informed decisions with regard to investment options available under the Plan. This duty applies to all of the Plan's investment options, including investment in the Fund and Bausch & Lomb stock.

236.     The Defendants breached their ERISA duty to inform participants by failing to provide complete and accurate information (a) regarding the health risks that accompanied *ReNu*, (b) the Company's earnings and financial statements  and (c) the prudence of investing retirement contributions in the Fund, which they knew or should have known.

237.     These failures were particularly devastating to the Plan and the participants, as a significant percentage of the Plan's assets were invested in the Fund during the Class Period, with acquisitions of Fund shares occurring at significantly inflated prices.  Thus, the Fund's precipitous decline had an enormous impact on the value of participants' retirement assets.

Similarly, during the Class Period, Plan assets could have been invested in other Plan Funds which did not carry the same risk as the Stock Fund and which outperformed investments in the Stock Fund.  Had such disclosures been made to participants, or Plan fiduciaries, if any, who were not aware of *ReNu* health risks and the misrepresentation and omissions regarding the Companies financial condition and the inevitable impact of such risks on Bausch & Lomb's stock price, they could have taken action to protect the Plan.  The disclosure to participants necessarily would have been accompanied by disclosure to the market and would have assured that any further acquisitions of Bausch & Lomb stock by the Plan would have occurred at an appropriate price.

238.    As a consequence of the failure of Defendants to satisfy their duty to provide complete and accurate information under ERISA, participants lacked sufficient information to make informed choices regarding investment of their retirement savings in the Fund.

239.    Defendants' failure to provide complete and accurate information regarding Bausch & Lomb and the Fund was uniform and Plan-wide, and impacted all Plan participants the same way, in that none of the participants received crucial, material information regarding the risks of the Fund as a Plan investment option and that all Plan acquisitions of employer stock during the Class Period occurred at inflated prices.

240.    As a consequence of Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses.  If Defendants had discharged their fiduciary duties to prudently disclose material information, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiffs and the other Class members, lost millions of dollars of retirement savings.

241.    In addition, any Plaintiffs or Plan participants who cashed out of the Plan have been damaged because they were deprived of the full value of their vested retirement benefits by Defendants' actions.

242.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT III

## **Failure to Monitor Fiduciaries**

243.    Plaintiffs incorporate by reference the allegations above.

244.    This Count alleges fiduciary breach against the following Defendants:  Bausch & Lomb, the Director Defendants, the Administrative Committee Defendants (the "Monitoring Defendants").

245.    As alleged above, during the Class Period the Monitoring Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

246.    As alleged above, the Monitoring Defendants assumed a duty to monitor the performance of other fiduciaries through (a) their responsibility to appoint, and remove those fiduciaries; (b) the discretionary authority obtained by their actions in connection the Plan, or; (c) their actual control of their employees and agents in the performance of their fiduciary duties and responsibilities under the Plan:

| *Monitoring Fiduciary* | *Monitored Fiduciary* |
|---|---|
| Defendant Bausch & Lomb | The Director Defendants; the Administrative |

| | Committee Defendants; and the Investment Committee Defendants. |
|---|---|
| Director Defendants | The Administrative Committee Defendants and the Investment Committee Defendants. |
| Administrative Committee Defendants | The Investment Committee Defendants. |

247.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

248.    The monitoring duty further requires that appointing fiduciaries have procedures in place, so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the Plan's performance, and by ensuring that the monitored fiduciaries have an appropriate process for obtaining the information and resources they need).  In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

249.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in his/her possession that he/she knows, or reasonably should know, that the monitored fiduciaries must have in order to prudently manage the plan and plan assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

250.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things: (a) failing, at least with respect to the Plan's investment in the Fund, to monitor their appointees, to evaluate their performance, or to have any system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and inaction with respect to company stock; (b) failing to ensure that the monitored fiduciaries appreciated the true extent of Bausch & Lomb's misrepresentations and nondisclosures regarding the risks of *ReNu*, the financial condition of the Company and the likely impact of such misrepresentations on the value of the Plan's investment in the Fund; (c) to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plan's assets, and; (d) failing to remove appointees whose performance was inadequate in that they continued to make and maintain huge investments in the Fund, despite their knowledge of misrepresentations and nondisclosures that rendered the Fund an imprudent investment during the Class Period for participants' retirement savings in the Plan.

251.    As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses.  If the Monitoring Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiffs and the other Class members, lost millions of dollars of retirement savings.

252.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plan

caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT IV

### Co-Fiduciary Liability

253.    Plaintiffs incorporate by reference the allegations above.

254.    This Count alleges co-fiduciary liability against the following Defendants: Bausch & Lomb, the Director Defendants, the Administrative Committee Defendants, and the Investment Committee Defendants (the "Co-Fiduciary Defendants").

255.    As alleged above, during the Class Period the Co-Fiduciary Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

256.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same Plan, if he/she knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach.

257.    Knowledge of a Breach and Failure to Remedy.  ERISA § 405(a)(3), 29 U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if, he has knowledge of a breach by such other fiduciary, unless he/she makes reasonable efforts under the circumstances to remedy the breach.  Upon information and belief, Bausch & Lomb, the Director Defendants, the Administrative Committee Defendants and the Investment Committee Defendants knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.  In particular, they did not communicate their knowledge of the Company's illegal activity to the other fiduciaries.

258.    Bausch & Lomb, through its officers and employees withheld material information from the market, provided the market with misleading disclosures, and profited from such practices, and, thus, knowledge of such practices is imputed to Bausch & Lomb as a matter of law.

259.    In particular, the Director Defendants, Administrative Committee Defendants and the Investment Committee Defendants -- by virtue of their positions at Bausch & Lomb, and by virtue of their knowledge of the financial and health risk arising from the use of *ReNu* and the financial condition of the Company -- participated in and/or knew about the Company's misrepresentations and omissions regarding (a) *ReNu*, (b) the Company's financial statements and (c) the consequences of the misrepresentations and omissions, including the artificial inflation of the value of Bausch & Lomb stock.

260.    Because Bausch & Lomb, the Director Defendants, the Administrative Committee Defendants and the Investment Committee Defendants knew of the Company's misrepresentations, they also knew:  (a) that co-Defendants were breaching their duties by continuing to invest in company stock, and; (b) that the co-Defendants were breaching their duties by providing incomplete and inaccurate information to participants.  Yet, they failed to undertake any effort to remedy these breaches.

261.    Knowing Participation in a Breach.  ERISA § 405(a)(1), 29 U.S.C. § 1105(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same Plan, if he/she participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. Bausch & Lomb knowingly participated in the fiduciary breaches of its co-Defendants in that it benefited from the sale or contribution of its stock at artificially inflated prices.  Bausch & Lomb

also, as a de facto fiduciary, as alleged above, participated in all aspects of the fiduciary breaches

of the other Defendants, which it controlled.  Likewise, the Director Defendants, the

Administrative Committee Defendants and the Investment Committee Defendants knowingly

participated in the breaches of the co-Defendants  because, as alleged above, they had actual

knowledge of the Company's misrepresentations and nondisclosures regarding its financial

statements and the health risks of *ReNu* and the impact such disclosure would have on

Company's stock price.  Yet, ignoring their fiduciary responsibilities, they permitted co-

Defendants to breach their duties.

262.    Enabling a Breach.  ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on

a fiduciary if, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the

administration of his specific responsibilities which give rise to his status as a fiduciary, he has

enabled another fiduciary to commit a breach.

263.    Defendants enabled the breaches of the Administrative Committee and

Investment Committee Defendants, because they failed to provide complete and accurate

information to the Administrative Committee, the Investment Committee or the participants that

would have protected the Plan and Plan participants from harm.

264.    The Monitoring Defendants failure to monitor the Director Defendants, the

Administrative Committee Defendants and the Investment Committee Defendants and enabled

those Defendants to breach their duties.

265.    As a direct and proximate result of the breaches of fiduciary duties alleged herein,

the Plan, and indirectly Plaintiffs lost millions of dollars of retirement savings.

266.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and

1132(a)(2) and (a)(3), the Co-Fiduciary Defendants are liable to restore the losses to the Plan

caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT V

### Knowing Participation in a Breach of Fiduciary Duty

267.    Plaintiffs incorporate by reference the allegations above.

268.    This Count alleges knowing participation in a fiduciary breach against Bausch & Lomb.

269.    To the extent that Bausch & Lomb is found not to have been a fiduciary, or not to have acted in a fiduciary capacity with respect to the conduct alleged to have violated ERISA, Bausch & Lomb knowingly participated in the breaches of those Defendants who were fiduciaries and acted in a fiduciary capacity and, as such, is liable for equitable relief as a result of participating in such breaches.

270.    By virtue of Bausch & Lomb's inflated stock price, Bausch & Lomb benefited from the breaches of fiduciary duty in the following manner:  (a) on information and belief, Bausch & Lomb discharged its obligations to make contributions to the Plan in amounts specified by the Plan, and; (b) upon information and belief, Bausch & Lomb contributed or sold stock to the Plan while the value of the stock was inflated, as the result of Bausch & Lomb's materially misleading statements and omissions regarding the risks associated with *ReNu* and the Company's financial condition.

271.    Accordingly, Bausch & Lomb should be required to disgorge this benefit or a constructive trust should be imposed on treasury shares of Bausch & Lomb stock which would have been contributed to the Plan, but for Bausch & Lomb's participation in the foregoing breaches of fiduciary duty.

### CAUSATION

272.    The Plan suffered hundreds of millions of dollars in losses because substantial assets of the Plan were imprudently invested or allowed to be invested by Defendants in the Fund during the Class Period, in breach of Defendants' fiduciary duties.

273.    Defendants are liable for the Plan's losses in this case because: (a) a significant portion of the Plan's investment in the Fund was the result of Defendants' decisions to invest matching contributions in Bausch & Lomb stock and; (b) as to the portion of Plan assets invested in Bausch & Lomb stock as a result of participant contributions, Defendants are liable for the losses because they failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder. Defendants withheld material, non-public facts from participants, and provided inaccurate and incomplete information to them regarding the health risks of *ReNu*, the ongoing profitability and financial condition of Bausch & Lomb, and the soundness of Bausch & Lomb stock as an investment vehicle.

274.    As a result, the participants made the decision to contribute to the Plan, resulting in the Plan's purchase of Fund shares with both participant contributions and matching contributions (or the contribution of stock as a matching contribution) with incomplete information about the risks and value of the Fund, and the Fund itself remained overvalued.  Had Defendants made appropriate disclosures, the Plan would not have purchased overvalued shares. Defendants also are liable for losses that resulted from their decision to invest nearly all of the assets of the Bausch & Lomb Stock Fund in Bausch & Lomb stock rather than cash or other short-term investment options, as authorized by the Plan, and clearly prudent under the circumstances presented here.

275.    Had Defendants properly discharged their fiduciary and co-fiduciary duties the Plan would have avoided some or all of the losses that it, and indirectly, the participants, suffered.  Defendants could have properly discharged their duties by   fully and accurately disclosing material facts concerning investment in the Fund, eliminating the Fund as an investment alternative when it became imprudent, divesting the Plan of Fund shares when maintaining such an investment became imprudent, and investing Plan assets in alternative investments that were available to Plan participants during the Class Period

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

276.    Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been invested in the Fund during the Class Period.

277.    As a consequence of Defendants' breaches, the Plan suffered significant losses.

278.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a Plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary…who breaches any of the…duties imposed upon fiduciaries…to make good to such Plan any losses to the Plan…."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate…."

279.    With respect to the calculation of the losses to the Plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plan would not have made or maintained its investments in the challenged investment and, instead, prudent fiduciaries would have invested the Plan's assets in the most profitable alternative investment available to them.  Alternatively, losses may be measured, not only with reference to the decline in Fund share price relative to alternative investments, but also by calculating the additional Fund shares that the Plan would have acquired had the Plan fiduciaries taken appropriate steps to protect the

89

Plan. The Court should adopt the measure of loss most advantageous to the Plan. In this way, the remedy restores the Plan's lost value and puts the participants in the position they would have been in if the Plan had been properly administered.

280.     Plaintiffs and the Class are therefore entitled to relief from Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above, in an amount to be proven at trial, based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2) and (3), 29 U.S.C. §§ 1109(a) and 1132(a)(2); (3) injunctive and other appropriate equitable relief, pursuant to ERISA § 502(a)(3), 29 U.S.C. 1132(a)(3), for knowing participation by a non-fiduciary in a fiduciary breach; (4) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (5) taxable costs and interest on these amounts, as provided by law, and; (6) such other legal or equitable relief as may be just and proper.

281.     Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plan in this case.

## CLASS ACTION ALLEGATIONS

282.     **Class Definition**. Plaintiffs bring this action as a class action, pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and the following class of persons similarly situated (the "Class"):

> All persons, other than Defendants, who were participants in, or beneficiaries of, the Plan at any time between May 25, 2000 through May 3, 2006 and whose accounts included investments in the Bausch & Lomb Stock Fund.

283.   **Numerosity**.  The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown, Plaintiffs believe that there are, at a minimum, thousands of members of the Class and that many or all of these were participants for whose accounts the Plan held interests in the Fund.

284.   **Commonality**.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)   whether Defendants each owed a fiduciary duty to Plaintiffs and members of the Class;

(b)   whether Defendants breached their fiduciary duties to Plaintiffs and members of the Class, by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

(c)   whether Defendants violated ERISA, and;

(d)   whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

285.   **Typicality**.  Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and the other members of the Class each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

286.   **Adequacy**.  Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action, complex, and ERISA litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

287.   **Rule 23(b)(1)(B) Requirements**.  Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

288.   **Other Rule 23(b) Requirements**.  Class action status is also warranted under the other subsections of Rule 23(b) because: (a) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (b) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole, and; (c) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for:

A.   A Declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.   A Declaration that Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.   An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits that the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if Defendants had fulfilled their fiduciary obligations;

D.      Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.      An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F.      An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investment in Bausch & Lomb stock;

G.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

H.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

I.      An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.      An Order for equitable restitution and other appropriate equitable and injunctive relief against Defendants.

Dated:  February 5, 2008

Respectfully submitted:

**CHAMBERLAIN D'AMANDA**

  /s/ Matthew J. Fusco
Matthew J. Fusco
1600 Crossroads Building
Two State Street
Rochester, New York 14614
Tel: (585) 232-3730
Fax: (585) 232-3882
*Liaison Counsel*

**SCHATZ NOBEL IZARD, P.C.**
Robert A. Izard
William Bernarduci
20 Church Street

Hartford, CT  06103
Tel: (860) 493-6292
Fax: (860) 493-6290

*Co-Lead Counsel*

**SCHIFFRIN & BARROWAY, LLP**
Joseph H. Meltzer
Edward W. Ciolko
280 King of Prussia Road
Radnor, PA
Tel: (212) 907-0700
Fax: (212) 818-0477

*Co- Lead Counsel*

**GAINEY & MCKENNA**
Thomas J. McKenna
295 Madison Avenue, 4th Floor
New York, NY 10017
Tel: (212) 983-1300
Fax: (212) 983-0383

*Co-Lead Counsel*